James V. Sclafani and Flora F. Sclafani, et al. [1] v. Commissioner. Sclafani v. Comm'r
Docket Nos. 39863, 39864, 42708, 43336, 48972, 48973, 54482, 54483, 65418, 88031, 88034, 92196-92200. United States Tax Court
T.C. Memo 1963-298; 1963 Tax Ct. Memo LEXIS 47; 22 T.C.M. (CCH) 1526; T.C.M. (RIA) 63298; October 31, 1963
Albert I. Schmalholz, 50 Broadway, New York, New York, for the petitioners. [2] Joseph Touhill, Stephen M. Miller, and John J. O'Toole, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings involve income tax deficiencies and additions to tax for fraud, failure to file declarations of estimated tax, and substantial underestimation of estimated tax for the calendar years 1945 through 1949, and income tax deficiencies and additions to tax for negligence or intentional disregard of rules and regulations for the calendar years 1955 and 1956. The deficiencies and additions to tax as to each petitioner are hereinafter set forth. For the taxable years 1945 through 1949, the deficiencies and additions to tax are based primarily upon respondent's determination that the individual petitioners, principally Joseph L. Sclafani, had increases in net worth due to undisclosed income. Since the corporate petitioner appeared to be the source of income of the individual petitioners, the undisclosed *49 income of each individual was determined to be additional income of the corporate petitioner. Our findings of fact include general findings applicable to all petitioners and separate findings as to each petitioner. Some of the findings with respect to the separate petitioners, particularly the findings as to Joseph L. Sclafani and Lillian Sclafani, Docket No. 65418, apply also to the other petitioners in these consolidated cases. Additions to tax under section 294(d)(2), I.R.C. 1939, as to the individual taxpayers, are conceded by respondent upon the authority of Commissioner v. Acker, 361 U.S. 87 (1959). General Findings of Fact Some of the facts have been stipulated and such facts are found as stipulated. It is stipulated that during the years 1945 through 1957, the officers of Joseph L. Sclafani, Inc., were: Joseph L. Sclafani
President
Dominick L. Sclafani
Vice President
James J. Sclafani
Vice President
James V. Sclafani
Treasurer
William M. Sclafani
Secretary These individual petitioners will sometimes hereinafter be referred to by their first names, and Joseph L. Sclafani, Inc., will sometimes hereinafter be referred to *50 as the corporate petitioner. During the years 1945 to 1949, inclusive, the stockholders of the corporate petitioner were: Joseph L., James V., James J., Dominick L., William M., Victoria N., and Joseph Sclafani. To the extent pertinent here, it is stipulated that the Sclafani family consisted of two branches: (1) Louis, his wife Victoria N. and their five sons, James V., Joseph L., Dominick L., William M., and Leo, all except Leo being petitioners herein; and (2) Joseph (brother of Louis), his wife Josephine and their three children, James J., Marie, and Augusta. The number of shares of capital stock held by each of the individual petitioners and the total number of shares of capital stock outstanding of the corporate petitioner at December 31 of each of the years 1937 and 1944 through 1949 were as follows: Stockholder
1937
1944
1945
1946
1947
1948
1949
Joseph L.
61
264
284
294
294
314
334
James J.
31
123
143
153
153
173
193
William
31
131
151
161
161
181
201
Dominick
31
123
143
153
153
173
193
James V.
51
212
232
242
242
262
282
Total
205
853
953
1,003
1,003
1,103
1,203
Others
110
397
437
457
457
497
537
Total outstanding
315
1,250
1,390
1,460
1,460
1,600
1,740
*51 None of the individual petitioners maintained books of account during the taxable years. The corporate petitioner maintained its books of account and filed its returns for the taxable years on an accrual basis. In 1950 respondent's revenue agents began auditing the income tax returns for the taxable years of the corporate petitioner and of the individual petitioners, particularly Joseph. On April 27, 1956, Joseph was convicted in the United States District Court for the Eastern District of New York on seven counts of an eight-count information charging evasion of corporate and personal income taxes under section 145(b), I.R.C. 1939, during the years 1945 through 1949. Joseph was sentenced to concurrent terms of 15 months on each count, and fines of $5,000 on the first and sixth counts were imposed. That judgment of conviction was sustained by the United States Court of Appeals for the Second Circuit on March 30, 1959 (265 F. 2d 408, certiorari denied 360 U.S. 918). Counts one, two, and three of the eight-count information charged Joseph, as president of the corporate petitioner, with wilfully and knowingly attempting to defeat and evade income taxes *52 due and owing to the United States by the corporate petitioner for 1947, 1948, and 1949 by filing and causing to be filed false and fraudulent income tax returns for the corporate petitioner. Count two, relating to 1948, was subsequently dismissed. Counts four and five charge Joseph with wilfully and knowingly attempting to defeat and evade income taxes due and owing by himself and his wife for 1945 and 1946 by making, filing, and causing to be filed with representatives of the Treasury Department certain false and fraudulent statements of his financial condition for the purpose of concealing additional unreported net income for 1945 and 1946. Counts six, seven, and eight charge Joseph with wilfully and knowingly attempting to defeat and evade income taxes due and owing by himself and wife for 1947, 1948, and 1949 by filing and causing to be filed with the collector of internal revenue false and fraudulent joint income tax returns wherein their income was understated. In the course of the 1950 investigation, respondent's agents wrote to each of the other individual petitioners and asked him to come into the office for questioning. When he failed to receive a reply, the revenue agent *53 requested their attorney to see that these individuals visited the internal revenue office. The attorney refused this request and the other individual petitioners did not visit the agent's office. Joseph L. Sclafani and Lillian Sclafani Docket No. 65418 For the calendar years 1945 through 1949 respondent determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1939 as follows: Additions to Tax
Sec. 294
Sec. 294
Year
Income Tax
Sec. 293(b)
(d)(1)(A)
(d)(2)
1945
$27,016.91
$13,508.46
$2,644.00
$1,586.40
1946
3,442.07
1,721.04
309.63
185.78
1947
31,291.14
15,645.57
3,085.97
1,851.58
1948
1,242.54
621.27
102.82
61.69
1949
6,175.71
3,087.86
601.48
360.89
The issues presented for each of the taxable years are: (1) whether petitioners received unreported income during each of the taxable years, such income including dividends and capital gains determined by use of the net worth and expenditures method; (2) whether a medical expense deduction of $185.91 for 1949 was properly disallowed; (3) whether any part of any deficiency is due to fraud with intent to evade *54 tax; (4) whether there should be additions to the tax for each taxable year for failure to file a declaration of estimated tax; and (5) whether the statute of limitations bars any of the deficiencies determined. Lillian Sclafani is a party to this proceeding. She failed to appear at the hearing either in person or by counsel. The Commissioner's motion for judgment by default as to her was taken under advisement. Findings of Fact Petitioners Joseph L. and Lillian Sclafani are husband and wife. At all times pertinent to this proceeding they resided at 8312 19th Avenue, Brooklyn, New York, 1951 81st Street, Brooklyn, New York, and Oakley Lane, Greenwich, Connecticut. For the taxable years 1945-1949, inclusive, the petitioners timely filed their joint income tax returns with the collector of internal revenue for the first district of New York. Joseph, a brother of James V., Dominick, and William, and a cousin of James J; petitioners herein, was born in 1912. He finished grammar and high school, attended college at night for part of a year and then dropped out because he was more interested in business than an education. Thereafter, he worked full time as a salesman in the wholesale *55 grocery business operated by his father and uncles. During his grammar and high school years he worked in the grocery business after school and on weekends. He earned his first salary in the summer of 1926, when 14 years of age, by working as a bank messenger. In the summer of 1928 he worked again as a bank messenger. Prior to May 1931, Joseph lived with his parents and brothers at the family home at 1951-81st Street, Brooklyn, New York. In May 1931, shortly after attaining 19 years of age, Joseph married Lillian Rinelli, daughter of Peter and Josephine Rinelli. Thereafter, Joseph lived with the Rinelli family, first in their family home at 8312-19th Avenue, Brooklyn, and later in their family home at Oakley Lane, Greenwich, Connecticut. Joseph and Lillian have two children, a son, Joseph R., born in July 1932, and a daughter, Liliana N., born in June 1933. The occupants of the Rinelli family home in Brooklyn were Peter and his wife, Josephine, Lillian and her husband and their two children, Lillian's sister, Anna Mangiere, and her husband, Joseph Mangiere, Lillian's sister Catherine Rinelli, and her brother, Peter Rinelli, Jr., who has been blind since birth. In or about 1934 *56 Joseph started operating independently. In 1935 his older brother James V., his father, and his uncle Joseph came into the business with him. In 1937 he organized the petitioner corporation, and thereafter he and several of his relatives owned Joseph L. Sclafani, Inc., which operated a wholesale food business. The same individuals owned the Sclafani Winecorporation and Sclafani Brothers, Inc. The approximate percentage of outstanding stock of the corporate petitioner held by each officer in 1937 was: Joseph 19; James V., 16; Dominick, William, and James J., 10 each. Subsequent to 1937, even though the number of shares owned by each officer increased from time to time, their percentage of ownership remained relatively constant. The wholesale grocery business, as operated by Joseph, individually, and then by the corporate petitioner, consisted of selling principally Italian food products imported from Europe and a domestic line such as tomatoes and tomato paste. The business used salesmen to solicit orders from stores and to collect accounts. A voucher system, installed in or about 1940, provided a number for each sale. The salesmen sent their orders, which were numbered and in triplicate, *57 to the office, where they were filled, the merchandise delivered, and the sales entered on the books in their numerical order. The merchandise was sold on credit, but the customer was allowed one percent off if he paid within 10 days. Usually, customers took from 30 to 60 days to pay their bills. In a business operation of this type, capital was required to purchase the imported and domestic foodstuffs, to maintain an inventory thereof, and to extend credit to customers. Joseph's capital was limited when he started his wholesale grocery business. Prior to 1937, he, his father, his uncle, and his brother James V. sought to increase the available business capital by accepting minimum compensation for their services. From 1937 to 1940, inclusive, Joseph and his relatives sought to improve the corporate petitioner's financial standing by having Joseph individually retain and deposit their seven salary checks in the corporate account. In lieu of their salaries, the brothers and cousin accepted a small portion thereof as spending money, and Joseph's mother and his aunt received $50 each per week for the living expenses of their respective families. In 1940 and prior thereto Joseph's brothers *58 and his cousin lived with their respective parents. All of them, Joseph, his brothers, cousin, father, and uncle, received the same salary. Joseph used the retained portion of their salaries to finance the wholesale grocery business, the sales of which were increasing. During the period 1941 to 1946, inclusive, James V., William, and James J. served in the armed forces. Joseph or Dominick were given powers of attorney by their brothers and cousin as each entered military service. Under these powers the corporate salaries paid to these men while in the armed forces were collected and turned over to Joseph individually, who used such salaries, in large part, in promoting the wholesale grocery business of the corporate petitioner. According to the income tax returns of the corporate petitioner, the salaries paid from 1940 through 1946 aggregated $19,783.06 to James V., $22,391.06 to William, and $28,761.06 to James J. A major, but undisclosed, portion of the total salary paid each of his brothers and his cousin during these years was retained by Joseph individually and used to finance the business operations of the corporate petitioner. Prior to 1937 Joseph was a salesman for Sclafani *59 Brothers, Inc., and Sclafani Wine Corporation. During 1937, and thereafter, he was a salesman and a collection agent for the corporate petitioner herein. During the taxable years Joseph was one of four or five salesmen on the road covering a territory north to New Haven andhartford, Connecticut, south as far as Washington, D.C., and west as far as Rochster, New York, and Scranton, Pennsylvania. Usually, he and the other salesmen were on the road four or five days and in the office one or two days per week. During the taxable years Joseph usually visited 30 to 40 stores daily taking orders and collecting accounts. His sales represented about 50 percent of the total corporate sales. In making collections, he and the other salesmen accepted in payment the customer's personal check, government checks (city, state, or Federal) received by the merchant from his customers, and currency. In addition, and as was customary in the grocery trade, Joseph accepted checks in excess of the amount of the customer's bill as an accommodation and gave him the difference in cash. In order to cash these additional checks, Joseph had to carry with him a substantial amount of cash, some of which was his, *60 as the corporate petitioner did not start him out with any cash. Joseph and the other salesmen accounted for their collections by preparing a collection report which they mailed to the office along with their orders. The collection report informed the bookkeeping department of the collections made by the salesman and the source thereof. The collection report listed each collection and showed the sales invoice number, the name of the customer, the net cash collected, the discount allowed, if any, the invoice amount of the sale, and a column entitled "General," in which the salesman showed any amount of money deposited in addition to or other than collections on accounts receivable. Any loans or advances made to the corporate petitioner would be shown in the "General" column of the collection report, as would also any collection on returned or bad checks previously accepted from a customer. In addition to collection report forms, Joseph and the other salesmen carried bank deposit tickets and endorsement stamps. At the time he prepared his collection report, the salesman also prepared a bank deposit ticket which was mailed with his remittance to one of the banks used by the corporate *61 petitioner in its business operations. The salesman's remittance to the bank was intended to be in the same amount as that shown on his collection report. Upon receipt of the deposit, the bank mailed an acknowledgment thereof to the corporate petitioner. After matching the salesman's collection report with the bank's acknowledgment, but not before, the bookkeeping department entered the collections and the deposit on the books of the corporate petitioner. Upon posting a collection to the accounts receivable, the bookkeeping department noted on the face of the collection report the page number of the sales journal that contained such account receivable. Customers' checks included in the salesman's deposit with the bank were listed on the collection report. A collection report was supposed to accompany all deposits of money. In depositing collections Joseph used his own salary and expense checks, the retained salary checks of his relatives, and his own personal checks in lieu of the currency, government checks, and other checks collected from customers. Joseph used part of the funds derived from these salary and expense checks to finance the business of the corporate petitioner. All *62 the financing of the business was handled by Joseph, who used the funds placed in his hands by his relatives as if they were his own. Joseph and the other stockholders originally invested $31,500 in the corporate petitioner, which had sales totaling $661,866 in its first year of operation. It realized these sales from a starting inventory of $41,316, purchases during 1937 of $647,983, and an ending inventory of $75,619. In financing the business operations, Joseph sought credit at numerous banks. He secured a line of credit at three banks, namely, the New Haven Bank, the Manufacturers Trust Co., and Banco Di Napoli, which later became the Bank of Athens Trust Company. At other banks Joseph had to pledge collateral in order to secure funds to finance the corporate petitioner. Such collateral included his own insurance policies along with his mother's, aunt's, and brothers'. The capital required to finance the business increased as corporate sales increased. Joseph borrowed money as follows: Date
Amount
Bank
5-11-40
$ 3,000
Bank of the Manhattan
Company
5-17-40
600
Bank of the Manhattan
Company
7-12-40
1,400
Bank of the Manhattan
Company
2-24-41
1,750
Bank of the Manhattan
Company
3- 7-41
2,450
Bank of the Manhattan
Company
8-25-47
8,500
GreaterNew York Sav-
ings Bank
3-10-49
30,326
Bank of Athens Trust
Company
*63 The parties stipulate that the net worth of Joseph and his wife, as of December 31 of each year 1944 through 1949, and their personal expenditures for the taxable years, shall include certain assets, liabilities, and personal expenditures, the amounts of which are stipulated for each year. In addition, the parties stipulate certain facts with respect to other items without stipulating that such items shall be included in the net worth of Joseph and his wife. The propriety of including these and other items in Joseph's and Lillian's net worth computation is in dispute. Joseph continuously maintained checking accounts during all or part of the taxable years with the Bank of Athens Trust Company, New York, N. Y.; New Haven Bank, N.B.A., New Haven, Connecticut; Bank of the Manhattan Company, Brooklyn, New York; and First National Bank in Greenwich, Connecticut. The stipulated year-end balance in each account, 1944 through 1949, was as follows: Bank of Man-
Dec. 31
Bank of Athens
New Haven
hattan
First National
1944
$ 3,086.36
$ 637.73
$3,422.36
1945
6,071.96
1,189.96
1,499.02
1946
9,150.64
732.09
945.45
1947
3,619.42
4,152.38
973.23
$ 943.27 *
1948
284.00
3,463.69
1,344.51
850.27
1949
19,596.89
4,348.99
1,723.55
1,553.75
*64 The bank records show total deposits to and withdrawals from these checking accounts as follows (cents omitted): Bank of Athens Trust Co.
New Haven Bank, N.B.A.
Year
Deposits
Withdrawals
Deposits
Withdrawals
1945
$33,564
$30,578
$ 582
$ 29
1946
89,773
86,695
925
1,383
1947
32,142
37,674
11,735
8,314
1948
54,172
57,508
5,268
5,957
1949
72,128
52,815
4,728 *
4,806 *
Bank of Manhattan Co.
First National Bank
Year
Deposits
Withdrawals
Deposits
Withdrawals
1945
$ 8,038
$ 9,962
1946
6,166
6,720
1947
4,533
4,505
$1,622
$ 678
1948
8,348
7,976
2,958
2,051
1949
10,902
10,523
9,954
9,251
On August 25, 1947, four savings accounts were opened at the Greater New York Savings Bank in New York, N. Y., accounts numbered 368685 and 368686 being in Joseph's name, account No. 368687 being Joseph L. Sclafani in trust for Liliana N. Sclafani, and account No. 368688 being Joseph L. Sclafani in trust for Joseph R. Sclafani. The year-end (December 31) balances of these *65 savings accounts for the taxable years 1947 through 1949 were as follows: Dec. 31 Balance
Account
No.
1947
1948
1949
368685
$600.66
$ 207.25
*
368686
226.90
1,627.81
$1,707.78
368687
100.00
703.26
1,010.25
368688
100.00
844.77
1,066.99
The bank records show total deposits to these savings accounts, including interest and withdrawals from account No. 368685, as follows: Joseph L. Sclafani
Joseph L. Sclafani
in trust for
No. 368685
No. 368686
Liliana
Joseph R.
Year
Deposits
Withdrawals
Deposits
Deposits
Deposits
1947
$ 600.66
$ 226.90
$100.00
$100.00
1948
7.03
$ 400.44
1,400.91
603.26
710.49
1949
6,937.01
7,144.26
79.97
306.99
256.50
During the years 1945 through 1948 six savings accounts were maintained with the Dime Savings Bank of Brooklyn, 86th Street and 19th Avenue, Brooklyn, New York. These six savings accounts were: Account No. 35185 in the name of Lillian R. Sclafani in trust for Joseph Robert Sclafani; account No. 88440, Lillian R. Sclafani in trust for Liliana N. Sclafani; *66 account No. 88443, Lillian R. Sclafani (these three accounts were closed February 20, 1948); account No. 134245, Liliana N. Sclafani, opened June 16, 1945 and closed March 13, 1947; account No. 135106, Joseph R. Sclafani, opened July 13, 1945 and closed August 29, 1947; and account No. 155545, Liliana N. Sclafani, opened March 13, 1947 and closed August 28, 1947. The bank's records show the year-end (December 31) balances of these six savings accounts for the years 1944 through 1948 as follows: Account No.
1944
1945
1946
1947
1948
35185
$67.41
$ 68.76
$ 70.13
$71.53
None
88440
29.77
30.36
30.96
31.57
None
88443
10.91
11.12
11.34
11.56
None
134245
5.00
82.18
None
None
135106
100.00
178.91
None
None
155545
None
None Accounts numbered 35185, 88440, and 88443 show total deposits plus interest for the period 1945 to February 20, 1948 of $4.83, $2.11, and $0.76, respectively. The only withdrawals from these accounts were the closing withdrawals which were in the amounts of $72.24, $31.88, and $11.67, respectively. The other three accounts were more active, showing total deposits plus interest *67 and withdrawals as follows: Liliana N. Sclafani
Joseph R. Sclafanl
Account No. 134245
Account No. 135106
Year
Deposits
Withdrawals
Deposits
Withdrawals
1945
$130.00
$125.00
$200.00
$100.00
1946
302.18
225.00
253.91
175.00
1947
170.82
253.00
284.58
463.49 Account No. 155545 in the name of Liliana N. Sclafani showed total deposits plus interest of $253.96 and total withdrawals of $253.96. During the taxable years 1947, 1948, and 1949 three savings accounts were continuously maintained with the First National Bank in Greenwich, Connecticut. The total deposits plus interest and withdrawals from such accounts were as follows: Lillian R. Sclafani
Lilliana N. Sclafani
Joseph R. Sclafani
Account No. 12679
Account No. 12564
Account No. 12565
Year
Deposits
Withdrawals
Deposits
Withdrawals
Deposits
Withdrawals
1947
$92.00
$10.00
$168.50
None
$529.23
None
1948
95.58
75.00
250.74
$155.00
296.14
$ 40.00
1949
58.19
90.00
1.86
205.00
348.91
100.00 The year-end (December 31) balances in these accounts *68 were as follows: Account No.
1947
1948
1949
12679
$ 82.00
$102.58
$ 70.77
12564
168.50
264.24
61.10
12565
529.23
785.37
1,034.28
It is stipulated that Joseph R. Sclafani and Liliana N. Sclafani had no taxable income during the taxable years 1945 through 1949 which was not reported on the returns of Joseph L. Sclafani. The bank accounts in the name of Joseph R. Sclafani and Liliana N. Sclafani during the taxable years were not assets of Joseph or Lillian, the year-end (December 31) balance of which should be included in their net worth. The bank accounts in the name of Joseph in trust for his children and in the name of Lillian in trust for her children during the taxable years were not assets of Joseph or Lillian, the year-end (December 31) balances of which should be included in their net worth. The year-end (December 31) balances of which should be included in their net worth. The year-end (December 31) balances of the other bank accounts, stipulated above, were assets of Joseph or Lillian and were part of their net worth. During 1945 Joseph bought, by cash subscription, 2 1/2 percent U.S. Treasury bonds of 1967-72 totaling *69 $47,000. The dates of purchase and amounts purchased were as follows: May 29, 1945
$25,000
June 1, 1945
10,000
November 15, 1945
7,000
November 15, 1945
5,000 On or about June 8, 1945, Antonio Di Salvo bought, by cash subscription, a $5,000 2 1/2 percent U.S. Treasury bond of 1967-72. Part of this purchase was for Joseph, who paid Di Salvo $2,000 cash on the purchase price thereof. Joseph retained these U.S. Treasury bonds through 1949. During the period 1941 to 1949, inclusive, Joseph and Lillian purchased and held United States Government savings bonds, Series E, of various denominations. In most instances, the bonds were issued to co-owners or an owner and beneficiary, that is, made payable on death (P.O.D.) to a designated relative, such as wife, brother, daughter, son, or sister-in-law, Lillian, Dominick, Liliana, Joseph R., and Catherine (Catherine A. Rinelli), respectively. The year and date of purchases, the certificate number, the person or persons to whom issued, the cost thereof, and the annual totals were as follows: Date of
purchase
Certificate No.
To whom issued
Cost
1941
May 23
M142904E
Joseph P.O.D. Catherine
$750.00
Dec. 18
C3346784E
Lillian P.O.D. Joseph R.
75.00
Dec. 18
C3346785E
Lillian P.O.D. Joseph R.
75.00
Dec. 18
C3346786E
Lillian P.O.D. Liliana
75.00
Total 1941 purchases
$ 975.00
1942
Sept. 16
Q64304209E
Lillian P.O.D. Liliana
$ 18.75
Dec. 16
D3425111E
Joseph P.O.D. Catherine
375.00
Dec. 16
M2934282E
Joseph P.O.D. Catherine
750.00
Dec. 16
M2975431E
Joseph P.O.D. Catherine
750.00
Total 1942 purchases
$1,893.75
1943
June 14
D6039752E
Joseph P.O.D. Catherine
$375.00
Total 1943 purchases
$ 375.00
1944
Mar. 23
C64193495E
Joseph P.O.D. Catherine
$ 75.00
May 22
D9506739E
Joseph P.O.D. Catherine
375.00
June 15
C64874683E
Joseph P.O.D. Catherine
75.00
Aug. 21
M8396651E
Joseph P.O.D. Catherine
750.00
Sept. 11
M8396654E
Joseph P.O.D. Catherine
750.00
Total 1944 purchases
$2,025.00
1945
Mar. 3
L123357634E
Joseph P.O.D. Dominick
$ 37.50
May 29
Q669076634E
Joseph P.O.D. Catherine
18.75
June 18
D13913148E
Joseph L. Selafani
375.00
Total 1945 purchases
$ 431.25
1946
Feb. 16
L157333453E
Joseph P.O.D. Dominick
$ 37.50
Mar. 5
M12212625E
Joseph or Catherine
750.00
Apr. 18
M12861585E
Joseph or Joseph, Jr.
750.00
May 17
M11007239E
Joseph L. Sclafani
750.00
Aug. 13
D15833362E
Joseph or Joseph, Jr.
375.00
Total 1946 purchases
$2,662.50
1947
Jan. 15
D17083818E
Joseph or Joseph, Jr.
$375.00
Feb. 21
L166380359E
Joseph P.O.D. Dominick
37.50
May 28
M15563901E
Joseph P.O.D. Catherine
750.00
June 20
M15750384E
Joseph or Joseph, Jr.
750.00
Sept. 12
M15743716E
Joseph or Joseph R.
750.00
Nov. 28
M16391981E
Joseph P.O.D. Liliana
750.00
Dec. 24
Q827371716E
Joseph P.O.D. Dominick
18.75
Dec. 24
M16643881E
Joseph or Joseph, Jr.
750.00
Total 1947 purchases
$4,181.25
1948
Jan. 20
Q829953720E
Joseph P.O.D. Lillian
$ 18.75
Jan. 20
Q829953721E
Joseph P.O.D. Joseph R.
18.75
Jan. 20
Q829953722E
Joseph P.O.D. Liliana
18.75
Jan. 20
L176752414E
Joseph P.O.D. Joseph R.
37.50
Jan. 20
L176752415E
Joseph P.O.D. Lillian
37.50
Jan. 20
L176752416E
Joseph P.O.D. Liliana
$ 37.50
Jan. 26
Q837010275E
Joseph P.O.D. Joseph R.
18.75
Mar. 2
D18819369E
Joseph P.O.D. Catherine
375.00
Apr. 30
D19069655E
Joseph P.O.D. Catherine
375.00
June 15
L182406018E
Joseph P.O.D. Joseph R.
37.50
June 15
C141267260E
Joseph P.O.D. Joseph R.
75.00
June 15
C141267261E
Joseph P.O.D. Joseph R.
75.00
June 18
D19691890E
Joseph P.O.D. Liliana
375.00
July 30
C142161110E
Joseph P.O.D. Liliana
75.00
July 30
R1819578E
Joseph P.O.D. Liliana
150.00
July 30
R1819579E
Joseph P.O.D. Liliana
150.00
Dec. 27
D20289993E
Joseph L. Sclafani
375.00
Total 1948 purchases
$2,250.00
1949
Jan. 7
D20684258E
Joseph or Joseph R.
$375.00
Mar. 11
C142367088E
Joseph P.O.D. Liliana
75.00
June 27
L197239738E
Joseph P.O.D. Dominick
37.50
June 27
C150044558E
Joseph L. Sclafani
75.00
June 27
D21463758E
Joseph L. Sclafani
375.00
June 27
M20727939E
Joseph L. Sclafani
750.00
July 11
R5616955E
Joseph L. Sclafani
150.00
July 11
L197239767E
Joseph L. Sclafani
37.50
Sept. 20
C153158255E
Joseph or Liliana
75.00
Dec. 20
L200604548E
Joseph L. Sclafani
37.50
Dec. 20
C156257927E
Joseph L. Sclafani
75.00
Dec. 20
C156257928E
Joseph L. Sclafani
75.00
Dec. 20
D21197587E
Joseph P.O.D. Liliana
375.00
Dec. 23
L199874773E
Joseph P.O.D. Liliana
37.50
Dec. 23
D21939944E
Joseph P.O.D. Liliana
375.00
Dec. 23
D21939962E
Joseph P.O.D. Liliana
375.00
Total 1949 purchases
$3,300.00
*70 The parties have stipulated that Joseph and Lillian owned certain investments in business at December 31 of each of the years 1944 through 1949 and have stipulated the amounts of such business investments at December 31 of each year. Joseph made other investments in business in addition to those stipulated. On or about April 16, 1945, Joseph personally deposited $7,500 with the Vitas Packing Company of Williamstown, New Jersey, which was engaged in canning tomatoes, beans, and other vegetables. The deposit, stipulated as to amount, was made in connection with the possible purchase of the cannery, or as a deposit on the purchase of merchandise. By check dated March 29, 1946, Vitas Packing Company returned this deposit to Joseph personally. Early in 1946, Violet Packing Co., a New Jersey corporation, organized in December 1945 with Joseph as president, purchased the assets of the Vitas Packing Company including its real estate, plant and equipment, inventory and its Violet trade brand. Violet Packing Co. paid $55,000 on the purchase price on or about February 19, 1946, and the remainder, $7,751.70, representing inventory and supplies, on April 2, 1946. Violet Packing Co. obtained *71 the cash used in purchasing Vitas Packing Company's assets from the corporate petitioner herein. On February 15, 1946, two $30,000 checks in favor of Violet Packing Co. were issued on the corporate petitioner's bank accounts and signed by Joseph as president, check No. 3273 being drawn on its account with Manufacturers Trust Company and check No. 5202 on its account with The New Haven Bank. Each check carried the notation thereon "exchge." The cash disbursements book of the corporate petitioner for February 1946 shows that each of these $30,000 checks was charged to the exchange account. The books and records of Violet Packing Co. show the receipt of the $60,000 and its deposit in Violet Packing Co.'s account at Manufacturers Trust Company on February 15, 1946 and the issuance of $60,000 of capital stock therefor by February 28, 1946. Such books and records further show the additional issuance of capital stock for $5,000 cash in March 1946, $10,000 cash in April 1946, and $5,000 cash in May 1946. In December 1946 and January 1947, $7,000 more was paid. The minutes of the first meeting of Violet Packing Co. provided for the issuance of $80,000 of capital stock in eight 100-share *72 certificates, each certificate representing $10,000 to be paid in by each of the following subscribers: Joseph L., Dominick L., James V., William M., Joseph, Louis, James J. Sclafani, and Peter C. Sozzi, previously employed by Vitas. Under date of January 2, 1946, 100-share certificates were issued to each of such subscribers except Sozzi, two 50-share certificates being issued at a later date to his nominees for cash. No stock certificates were issued with respect to the $7,000 credited to Violet's capital stock account in December 1946 and January 1947. Between August 19 and November 6, 1946, inclusive, 10 collection reports with matching acknowledgements of the deposits at The New Haven Bank were applied against or credited to the corporate petitioner's exchange account in repayment of the $60,000 charged against the exchange account February 15, 1946. On or about May 26, 1947, and May 9, 1949, Joseph filed personal financial statements with The New Haven Bank in which he listed $10,000 of stock in Violet Packing Co. among his total assets. In a statement of financial condition of Joseph L. and Lillian Sclafani filed with the internal revenue service on June 22, 1950, and amended *73 on August 18, 1950 and on January 12, 1951, the Violet Packing Co. stock was omitted from the assets listed. Joseph purchased a $10,000 stock interest in Violet Packing Co. in 1946 and invested an additional $1,000 in such company during 1947. He continued to hold his $11,000 stock interest during the taxable years 1948 and 1949. In or about 1937 or 1938, Joseph invested in the Gaspe Export Corporation, a Canadian business venture. The Gaspe operation involved the purchase of codfish from fishermen, drying and salting the codfish, and shipping them to the United States for distribution. In or about 1944, the Canadian government purchased the machinery and the land used by Gaspe. Joseph realized approximately $20,000 therefrom and deposited $13,000 of the proceeds in his personal account at the Bank of Athens Trust Company on October 20, 1944. The funds invested in the Gaspe venture came from Joseph's wife. The parties have stipulated that the net worth of Joseph and Lillian shall include certain loans receivable, the amounts of which as of December 31 of each of the years 1944 through 1949 are stipulated. As of December 31, 1946 and 1947, the stipulated amounts of loans receivable *74 are $26,428 and $118,952.28, respectively. The books and records of the corporate petitioner in its loans payable account show these same amounts as being due on such dates. When the corporate petitioner's income tax return for 1947 was being audited in 1950, the revenue agent noticed the $92,524.28 increase in the loans payable account. A comparison of the canceled checks of the corporate petitioner with its cash receipts and disbursements book revealed that numerous checks had been made out to "Cash" but were entered on the books as disbursements to specifically named creditors. The revenue agent found 25 checks payable to "Cash" and one to Joseph. The 26 checks totaled $149,115.33. The revenue agent broke the total amount of these 26 checks down into two general categories, i.e., approximately $17,000 worth of checks which were deposited in Joseph's personal account with the Bank of Athens Trust Company and approximately $132,000 worth of checks that were deposited in the bank accounts of the corporate petitioner. The revenue agent traced about $92,000 of the $132,000 worth of checks through the cash receipts book into the loans payable account of the corporate petitioner, but *75 he was unable to trace the remainder. Joseph gave the internal revenue agent the following explanation of the relationship between the 26 checks and the 1947 increase in his loans receivable: During the normal course of business in the latter part of 1946 he personally paid the merchandise invoices of the creditors listed in the cash receipts and disbursements book as the payees of the checks issued to cash; he used funds obtained from his father-in-law, Peter Rinelli, in paying the invoices; he obtained $125,000 in cash from his father-in-law in 1938; the 26 checks represented reimbursements to him in 1947 for payments made by him on such merchandise invoices from September through December 1946; and the increase in 1947 loans payable represented amounts still due him from the corporate petitioner because of his payments for merchandise. In support of his explanation, Joseph furnished the internal revenue agent with 27 invoices for merchandise which were paid late in 1946 in accordance with their credit terms. Sixteen of these invoices were paid by checks drawn on Joseph's personal account with the Bank of Athens Trust Company and aggregated $57,517.39, five invoices were paid *76 by checks drawn on the corporate petitioner's bank account with The National City Bank of New York and aggregated $45,577.91, and the other invoices were paid by the deposit of funds to take up sight and demand drafts at various banks and aggregated $52,957.18. D. J. Salomone invoice dated December 2, 1946 for $12,060.81, one of these invoices, was paid out of Joseph's personal account by check dated December 7, 1946. It was not among the 1947 checks issued to "Cash" by the corporate petitioner. At or about the time the corporate petitioner issued its checks on its National City Bank account, Joseph deposited the funds necessary to handle the checks by means of collection reports and acknowledgment of the bank that the remittance had been received. Of the funds used in 1946 to pay for invoices of merchandise, $67,500 represented Joseph's personal funds. The increase in Joseph's loans receivable in 1947 of $92,524.28 and the similar increase in the corporate petitioner's loans payable resulted from the deposit to the credit of the corporate petitioner of four checks payable to "Cash." They were accounted for in the cash receipts book by a charge to loans payable. These four checks *77 were: one for $39,080.49, equal to the total of invoices of D. J. Salomone on September 23, 1946, Italian Food Products, Inc., November 26, 1946, and Hunt Foods, Inc., November 1, 1946; one for $22,320.15, equal to the Parrott & Co. invoice of September 26, 1946; one for $15,602.01, equals to the invoice of A. Bianco Co. of September 28, 1946; and one for $15,521.63, equal to the invoice of Albert Cortes (also referred to as Cortez) in October 1946. Joseph deposited seven of the checks made out to "Cash" in his personal account at the Bank of Athens Trust Company and cashed the remainder from time to time during 1947 as he made collections from customers and mailed in deposits. Prior to his death on August 29, 1939, Peter Rinelli had been wealthy. For many years prior to his death he maintained his family at 8312 - 19th Avenue, Brooklyn, New York. The Rinelli family home and grounds occupied the entire block between 83rd and 84th Streets on 19th Avenue with a frontage of 200 feet on 19th Avenue and a depth of 100 feet. The house had a frontage of approximately 90 feet, a detached garage accommodating four cars with chauffeur's quarters above, and a large lawn, about 100 by 110 feet. *78 Peter Rinelli did not drive a car, using chauffeurs until 1932 and thereafter one of his daughters or a son-in-law. The Rinellis had two maids in the house until 1942. The Rinellis spent their summers at a summer home on Lake Mahopac. In 1932 Peter Rinelli distributed his half interest in Smith Street Dock Corporation, represented by 75 shares of stock, equally among his four children. The stipulated value of the 18 3/4 shares distributed to Lillian at all times material hereto is $42,000. In or about 1928 Peter Rinelli gave to each of his children a stock interest in Rinelli Realty Corporation, which owned an apartment house at 2200 - 85th Street, Brooklyn, New York. The stipulated value of Lillian's one-fourth stock interest in the Rinelli Realty Corporation at all times material hereto is $30,850. Peter Rinelli was interested in Rinelli & Guardino, Inc., a Delaware corporation, engaged in the ship cleaning business. The Delaware corporation, according to its income tax return for the fiscal year ended June 30, 1933, "was lgally dissolved and liquidated all its assets. The plant and equipment, although valueless, was taken over by the stockholders at cost, less depreciation. *79 " For the fiscal year 1933 the Delaware corporation reported a net loss of $12,030.36. A New York corporation with the same name was organized in April 1933. For the calendar years 1933 through 1938, the New York corporation reported net losses on its tax returns as follows: $1,203.79, $2,042.96, $666.08, $2,256.97, $666.85, and $3,288.37, respectively. During some of these years the New York corporation reported salaries paid to Peter Rinelli, treasurer, as follows: 1933 - $350; 1934 - $835; 1935 - $1,505; 1936 - $725; and 1937 - $920. On or about January 27, 1930, Peter Rinelli created a trust, the corpus of which was seven life insurance policies, the annual premiums of which exceeded $8,200 and the face amount of which aggregated $200,000. At the time he created the trust, four of the policies secured loans with the insurance companies aggregating $25,406. Early in June 1933, there were three insurance policies remaining in the trust corpus and Rinelli, in seeking delivery of such policies to him free of the trust, informed the trustee bank that "I must collect this money immediately as I have to pay taxes on my different properties." Thereafter, and on June 23, 1933, Rinelli *80 revoked the trust. Rinelli disposed of the policies forming the trust corpus by surrendering three of them in 1931 for their cash surrender value, realizing $12,555.52 therefrom, and by surrendering four policies during 1933 and realizing therefrom $6,239.33. During the years that these seven policies remained in force, Rinelli borrowed at least $41,623.49 thereon. In addition to the above policies, Rinelli had two other policies on his life which were taken out in 1914 and 1917. In 1924 and 1925 he borrowed a total of $4,606.65 on these two policies. In 1931 he surrendered both policies, realizing therefrom $2,892.23. On July 7, 1930, Peter Rinelli borrowed $120,000 on property located at 130-132 Pearl Street through to 96-98 Water Street in New York. The loan was for a 5-year term at 6 percent interest and was secured by a mortgage on the premises and a personal bond. In January 1932 Peter Rinelli and his wife transferred the Pearl Street property to the Hanover Square Building Corporation, 8312 - 19th Avenue, Brooklyn, New York, hereinafter called "Hanover," such property being its sole asset. From time to time the interest rate on the loan was reduced, and in June of 1935 the *81 mortgagee offered to reduce the interest rate to Hanover to 3 percent. On August 1935, Rinelli replied that he was "not in a financial position at present to take advantage of your offer." The letter was signed "J. Mangiere per Peter Rinelli." On October 7, 1935, a receiver was appointed under foreclosure proceedings and the mortgagee acquired the property in April 1936. The final tax return of Hanover, signed by Peter Rinelli as president, was for the year 1935, and such return showed a loss for the year of over $14,000 and a loss on the depreciated basis of the Pearl Street property of $89,517. On or about February 2, 1932, Josephine Rinelli, Peter's wife, borrowed $15,000 on the family home at 8312 - 19th Avenue. On or about March 22, 1932, Josephine conveyed the family home, subject to the mortgage thereon, to "The 8312 - 19th Ave. Corp., a domestic corporation, having its principal place of business at #8312 - 19th Avenue, Brooklyn, N. Y." On or about March 14, 1944, the mortgage, dated February 2, 1932, was paid and satisfied. On or about March 24, 1944, The 8312 - 19th Avenue Corporation conveyed the Rinelli family home to Josephine Rinelli, Anna Mangiere, Peter Rinelli, Jr. *82 , and Catherine A. Rinelli, subject to a mortgage of $12,500. On or about March 24, 1944, Josephine Rinelli conveyed all her right title and interest in the Rinelli family home to Lillian Sclafani subject to the $12,500 mortgage. In July 1925 Peter Rinelli and his wife became jointly and severally liable on two separate bonds and mortgages, each for $22,000, which was borrowed from Citizens Savings Bank, New York City, and secured by the premises at 118 and 120 Elizabeth Street. The mortgage required the principal sum to be paid by May 15, 1930, but such payment was not made. Under date of May 31, 1932, Peter Rinelli and his wife and Stephen Guardino and Luisa Guardino conveyed their interests in the mortgaged premises to 118-120 Elizabeth Street Corporation. On August 24, 1936, the principal sum due and unpaid on each property was $19,200 plus past due interest and taxes. On the latter date the bank released Peter Rinelli and his wife, Stephen Guardino, and others from liability on their personal bond by accepting a deed from them. Thereafter, the bank foreclosed under the mortgage and bid in the properties at the foreclosure sale. Peter Rinelli, as president and treasurer of 118-120 Elizabeth *83 Street Corporation, executed the final income tax return of that corporation, which reported a loss for the calendar year 1936 of $2,702.74. Peter Rinelli's individual checking account for the period May 1, 1934 until his death showed deposits totaling nearly $57,000. The highest balance in this account was $5,845.24 on January 27, 1937, immediately after a $5,750 deposit was made. The balance in the account when it was closed out on September 29, 1939 was $215.19. The bank account for the Estate of Peter Rinelli, Deceased, was opened on September 29, 1939 with an initial deposit of $215.19; it was closed out on November 21, 1941 with a balance of $24.91. Peter Rinelli and his wife maintained a joint checking account which showed deposits in December of 1935 totaling $16,825.80. By June 1936 the account had been reduced to $306.79. In that month a deposit of $645 increased the balance in this account to $951.79. This joint account was closed out August 5, 1936 with an $11.45 check. Peter Rinelli opened a savings account on July 6, 1932 with an initial deposit of $10. No further deposits were made to this account, which was closed out January 15, 1945 by the administratrix of *84 the Estate of Peter Rinelli, Deceased, by the withdrawal of the $12.89 balance. For the taxable years 1928 through 1939, Peter Rinelli's income tax returns showed no tax liability except that he paid income taxes of $42.67 and $21.14 for 1933 and 1939, respectively. For the taxable year 1929 Peter Rinelli realized income from salaries, rents, dividends, etc., in the total amount of $19,176.24 and paid interest and taxes aggregating $9,419.19. He reported a loss of $3,968.20 for the taxable year 1929 because of a loss of $13,725.25 sustained on the sale of stock for $88,436.50 which had cost him $102,161.75. For the taxable years 1932 through 1939, no gift tax return was filed and no gift taxes were paid by Peter Rinelli, or by Joseph under the name of Peter Rinelli. No Federal estate tax return was ever filed in the name of Peter Rinelli, deceased, nor was a Federal estate tax ever paid. Peter Rinelli's will was filed December 21, 1939, but it was not probated. Instead, letters of administration were issued by the Surrogate's Court of Kings County to Josephine Rinelli, and, following her death in July 1945, Catherine Rinelli petitioned the Surrogate's Court for an order exempting *85 the estate of Peter Rinelli, deceased, from tax on the estates of deceased persons. In support of her petition, Catherine Rinelli filed a schedule showing that the estate of Peter Rinelli, deceased, had assets amounting to $2,586.25 and liabilities amounting to $1,665.81. Peter Rinelli made no cash gift of $125,000 nor of any similar amount to Joseph. After the death of Peter Rinelli, his widow and children continued to live at the family home. Shortly after Josephine's death and in September 1945, the Rinelli children purchased the property at the end of Oakley Lane in Greenwich, Connecticut. The purchase price of the property was $45,000, of which $10,000 was paid down on August 20, 1945 and $35,000 on September 14, 1945. The owner conveyed the property to Catherine Rinelli on September 14, 1945, and on the same day Catherine conveyed a quarter interest each to Peter Rinelli, Jr., Anna Mangiere, and Lillian R. Sclafani. The purchased property consisted of slightly more than 5 acres improved by a Mediterranean-style stucco house with tile roof. The house, which overlooked the lower Greenwich Reservior, was shaped like an L with one portion being 118 feet in length by 42 feet in *86 width and the other portion being 100 feet in lentgh and 22 feet in width. The second floor contained six master bedrooms, each with a bath, and the servants' wing had four rooms and one bath. There were two powder rooms downstairs and a four-car garage. The furnishings in the Rinelli family home at 8312 - 19th Avenue were moved to the Greenwich family home on Oakley Lane. On or about August 15, 1947, the Rinelli children contracted for the sale of 104 feet of the 200-foot frontage owned by them on 19th Avenue, together with the buildings and improvements thereon. The contract price of $37,500 was paid $1,200 upon execution of the contract, $13,800 upon delivery of deed, and with a $22,500 purchase money mortgage. The deed from the four Rinelli children to the purchaser and the purchase money mortgage for $22,500 in favor of the four Rinelli children were dated September 22, 1947. The parties have stipulated the value of Lillian's one-fourth interest in the real estate at 8312 - 19th Avenue, at Oakley Lane, Greenwich, Connecticut, and in the purchase money mortgage acquired from the sale of 8312 - 19th Avenue in 1947 at December 31 of all years material hereto. Similarly, the parties *87 have stipulated Lillian's one-quarter interest in a mortgage payable on 8312 - 19th Avenue, loans at Manufacturers Trust Company and Greater New York Savings Bank, and Joseph's liability on a $4,500 loan at Manufacturers Trust Company at December 31 of all years material hereto. At December 31 of each of the years 1944 through 1949 Joseph owned certain investments, securities, automobiles, and horses. The parties have stipulated the values thereof at all times material. The parties have also stipulated that a tractor, acquired in 1948, had a value of $1,902.34 at December 31, 1948 and 1949 for purposes of net worth of Joseph and Lillian. The living expenses of Joseph and Lillian for each of the taxable years 1945 to 1949, inclusive, have been stipulated as to the total amount paid for insurance premiums, the net amount of Federal income taxes paid, the automobile expenses, other deductions per income tax returns, and the amounts paid to 16 firms and individuals which were admittedly personal expenses but only five of which are admitted to be the personal expenses of Joseph. During the taxable years Joseph expended not less than $3,000 a year for food, clothing and entertainment *88 for his family. On their income tax returns for the taxable years 1945 to 1949, Joseph and Lillian reported income and claimed deductions for traveling expenses as follows: Dividends
Traveling
Year
Salaries
and interest
expenses
1945
$6,043.98
$ 835.00
$2,597.50
1946
5,600.00
1,927.90
2,497.00
1947
6,000.00
1,927.90
3,092.72
1948
6,000.00
2,181.03
2,592.72
1949
6,000.00
2,227.10
2,602.40
In determining the deficiencies in tax and additions to tax herein, the respondent increased the net income as disclosed by the joint returns to include in income unreported amounts received by petitioners which were deemed to be dividends from Joseph L. Sclafani, Inc., by amounts received which were deemed to be a return of capital from Joseph L. Sclafani, Inc., taxable as long-term capital gains, and by an amount received which was deemed to be a return of capital from Joseph L. Sclafani, Inc., taxable as short-term capital gain. The adjustments for the taxable years were as follows: Capital gains
Net
Net
income
Long
Short
income
Year
reported
Dividends
term
term
adjusted
1945
$ 2,980.89
$ 41,675.70
$ 7,207.04
$1,092.00
$ 52,955.63
1946
3,363.29
9,284.87
2,505.07
15,153.23
1947
3,152.19
47,968.09
13,265.59
64,385.86
1948
4,342.49
6,002.30
608.48
10,953.27
1949
4,159.44
21,447.78
4,213.94
30,007.07 *
Totals
$17,998.30
$126,378.74
$27,800.11
$1,092.00
$173,455.06
*89 The statutory deficiency notice for the taxable years is dated October 9, 1956. A part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. Opinion Respondent's theory in these consolidated cases is that the individual petitioner husbands were the active and dominant stockholders in the business of the corporate petitioner during the period 1945 through 1949; that their respective net worths had substantial and consistent increases during these years, which were made possible by the secret distribution of taxable amounts by the corporate petitioner; that they failed to report such distributions on their respective income tax returns for such years and failed to report the profits from which the distributions were derived on the income tax returns of the corporate petitioner for such years; and that the failure of the individual and corporate petitioners to report such additional income constituted fraud with intent to evade tax. For each of the taxable years 1945 through 1949 respondent determined that Joseph and Lillian received unreported income from the corporate petitioner *90 by way of dividends and capital gains. Respondent used the net worth and expenditures method to determine the additional income realized by petitioners for each taxable year and computed the dividends distributed and the capital returned by the corporate petitioner upon the basis of an analysis of corporate surplus and earnings available for distribution during the taxable years. Lillian did not appear and was not represented at the trial. The pleadings in the case of Joseph and Lillian raise no question relating to the statutory period of limitations, even though the deficiency notice was mailed October 9, 1956, more than 3 years after petitioners filed their income tax returns for the taxable years. However, on brief, Joseph invokes the statute as a defense and contends that respondent has the burden of proving that neither the 3-year period of section 275(a) nor the 5-year period of section 275(c), Internal Revenue Code of 1939, apply. In view of our determination on the fraud issue, it is immaterial whether the bar of the statute of limitations has been properly raised. Since Lillian did not appear and was not represented at the trial, the contentions mentioned are generally *91 those of Joseph even though they may sometimes be referred to in the plural. The burden of proving fraud is placed by statute upon the respondent. Section 1112, Internal Revenue Code of 1939. Although we have held that in such a case as this Joseph's conviction after trial for income tax fraud as to the same taxable period is not res judicata, see Commissioner v. Sunnen, 333 U.S. 591 (1948), nor collateral estoppel on the issues to be decided, Eugene Vassallo, 23 T.C. 656 (1955); cf. Julian Lentin, 23 T.C. 112 (1954), affd. 226 F. 2d 695 (C.A. 7, 1955), certiorari denied 350 U.S. 934; Meyer J. Safra, 30 T.C. 1026 (1958), a contrary view has recently been expressed in Lefkowitz v. Tomlinson, F. Supp. (D. Fla., Dec. 26, 1962). And we do not have here a plea of nolo contendere, cf. Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F. 2d 240 (C.A. 5, 1955), but a conviction after trial. See Stagecrafter's Club v. District of Columbia Division, 111 F. Supp. 127 (D.D.C., 1953); Abraham Galant, 26 T.C. 354, 365 (1956). But, be that as it may, our duty to *92 consider the prior proceedings does not stop there. The applicability of the doctrine of stare decisis must also be considered and the question then remaining is the extent to which the record in a prior case differs from the one under consideration. * * * [But] if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. * * * [If] consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of stare decisis. * * * Commissioner v. Sunnen, supra at p. 601. On the all-important issue of opening net worth, petitioner has concededly left the record in the same posture as it went to the jury in the prior trial. The real controversy here is the evidence on January 1, 1945 of a cash hoard of some $100,000 and its origin in a gift from Joseph's father-in-law, Peter Rinelli, in about 1938. As petitioner's brief states," "[the] 1956 [criminal trial] proofs concerning the Rinelli cash gift to Joseph in 1938, and the surrounding 1956 proofs as to Rinelli's wealth (and the wealth of his family after his death), *93 stand, as we have said, as the sole direct proofs before this Court on these issues by either side in this proceeding." Concerning these "proofs," the Court of Appeals said, in reviewing the judgment of conviction: * * * Sclafani's claim that the government failed to prove the lack of a possible source of additional funds held by him on January 1, 1945 is based solely on the government's alleged failure to rebut his uncorroborated claim that he had received a secret cash gift of $125,000 from his father-in-law, Rinelli, in 1938. Sclafani has not previously and does not now claim that the government excluded from opening net worth funds which he had received from any other source; he does not claim that the government failed to pursue relevant leads advanced by him. * * *
In satisfaction of its burden to establish opening net worth "with reasonable certainty," Holland v. United States, supra 348 U.S. at page 132, * * * the government rebutted the alleged gift with two related lines of proof. It introduced evidence tending to show that Rinelli, who died in 1939, was financially unable to [*] made such a gift in 1938, and that Sclafani's conduct had been inconsistent with the *94 possession of such a hoard of cash. Thus the government showed that neither Rinelli nor Sclafani ever filed a gift tax return for the gift and that although Rinelli died in 1939 within a year of the alleged gift, it was not included in his estate tax return; that although in the 1920's Rinelli concededly had considerable wealth, his annual income from 1928 onward was nominal or offset by losses; that the two Rinelli bank accounts found by the government showed small balances and no significant withdrawals from 1934 through 1939; that when Rinelli's once prosperous ship cleaning business was liquidated in 1933 its assets were practically worthless; that his real estate holdings were disposed of partly by gift prior to the alleged gift to Sclafani; that valuable property operated by Rinelli and held by him subject to a mortgage was taken by foreclosure proceedings in 1935, and that, prior to those proceedings, when the bank offered a low interest rate to allow Rinelli to continue the operation of the property, his reply was to the effect that his financial position prevented him from accepting the offer, that Rinelli mortgaged his home in 1932 for $15,000 at 6% interest and that the *95 mortgage was not paid off at the time of his death; that other property was sold at foreclosure proceedings in 1936; that Rinelli was subject to large deficiency judgments; that a $200,000 insurance trust, which by law was not subject to the claims of his deficiency judgment creditors, was revoked by Rinelli in 1933 "to pay taxes on my different properties" and that substantial loans and interest were first deducted; that Rinelli lived "well" during the depression though he had no apparent source of income after 1929; that Rinelli died less than one year after the alleged gift leaving his widow apparently without substantial funds. As to Sclafani the evidence showed that he had never claimed to have received such a gift prior to the investigation; that between 1938 and 1945 he borrowed small amounts from banks on several occasions although he claims the alleged gift was then in his possession and through most of the period was uninvested; that, although he said that he had not used the gift in his business because it was a condition of the gift that it not be so used, the only use he now claims to have made of it was in his business after allegedly not having made any substantial *96 use of it all for about seven years; that he discounted his customers' acceptances at 6% and rediscounted them with banks for 5% to make a 1% profit despite his alleged possession of sufficient cash to handle the discount himself and retain the full 6%; that in summaries of his financial position made to banks for the purpose of securing loans in 1946, 1947 and 1949 the highest amount of cash claimed by Sclafani was under $3,000; that Rinelli did not make similar gifts to other relatives; that the gift was allegedly made secretly and in cash; that it was never at any time banked or invested but was allegedly retained in a closet safe. Moreover no witness was produced to confirm the existence of the money in in Sclafani's possession. Indeed the only evidence in support of the gift is that of Sclafani himself. This evidence is sufficient to sustain the government's burden of establishing opening net worth with reasonable certainty. The only lead furnished the government as a possible source of additional net worth on the opening date was the alleged Rinelli gift, and this was exhaustively investigated. Although standing alone it may have constituted a reasonable explanation by the *97 taxpayer inconsistent with his guilt, see Holland v. United States, supra, 348 U.S. at page 135, * * * on this evidence the jury was justified in finding that the gift was never made. [United States v. Sclafani, supra], 265 F. 2d 408, at pp. 411-412, certiorari denied 360 U.S. 918.]
We realize that these legal determinations by the Court of Appeals do not relieve us, as the trier of the facts, of the obligation to come to a decision in this proceeding as to our view of the factual conclusions to be gathered from the evidence. This we have done, as incorporated in our findings of fact, and the ultimate findings dispose of these factual issues. But the contention that as a matter of law respondent has failed to sustain his burden of establishing the basis for a determination of fraudulent understatement is, in our view, met on the present record by reference to United States v. Sclafani, supra. Once the existence of the Rinelli cash is eliminated, the evidence shows conclusively that petitioners' net worth increased materially in each of the years 1945 through 1949. Concerning this aspect of the Government's case, the Court *98 of Appeals said, op. cit. at pp. 412-413: Even if as he claimed Sclafani employed $30,000 of a concealed fund in 1945, and $70,000 in 1947, there remains a substantial unexplained excess of the yearly increases in net worth independently proved by the government and the defendant's own testimony as to his cash and other resources. Such a discrepancy in the defendant's own testimony and financial reports amounting to about $130,000 of unexplained increase in net worth through the prosecution period is highly persuasive of guilt. "There could hardly be more conclusive independent evidence of the crime. * * * While the evidence as a whole must show a deficiency for each of the prosecution years, the corroborative evidence suffices if it shows a substantial deficiency for the over-all prosecution period." United States v. Calderon, 1954, 348 U.S. 160, 167, 168 * * *. * * * As to proof that net worth increases resulted from unreported income, it is well established that the government need not prove the specific source of proved increases in net worth in order to demonstrate their tax character as income; it is sufficient for it to prove "a likely source, from which the *99 jury could reasonably find that the net worth increases sprang." Holland v. United States, * * * 348 U.S. at page 138 * * *. * * *
Moreover, apart from the alleged gift, the taxpayer admitted that he had no other source of non-taxable income, and the government's prolonged investigation, though it revealed assets concealed by the taxpayer, did not disclose any other reasonably likely non-taxable source. United States v. Massei, 1958, 355 U.S. 595, * * * holds that as an alternative to proof of a "likely source" for the proved increases in a net worth case the government would succeed "should all possible sources of non-taxable income be negatived * * *" Although there is still no satisfactory explanation of the demonstrated increases in net worth, petitioner insists here and has produced evidence not introduced at the criminal trial purporting to show that the corporation's books were accurate and that no amounts of income could have been received by petitioners from that source. They go further and insist that, since the corporate records are purportedly complete and accurate, respondent was without authority to resort to the net worth method of ascertaining *100 the deficiencies. With this there are at least two difficulties. The first is that it is petitioner Joseph Sclafanl who should have kept the records from which his income could be determined, which he admittedly did not do; and the corporate records are at best a secondary and incomplete recourse. Moreover, it is highly doubtful whether it could be said in any event that the corporate records were regular, proper, or probative. Much reliance is placed upon the so-called "collection reports." Aside from being unusual, these are not sufficiently informative to demonstrate what the corporate receipts were or what part of them consisted of corporate as opposed to individual funds. Their use went far beyond what their name implies and purportedly included payments and receipts which had nothing to do with the collection of accounts owing to the corporation. Furthermore, two accounts on the corporate books entitled "Exchanges" and "Loans Payable (Receivable)," while they contain entries, are totally without explanation. And in at least one instance petitioners' own accounting witness testified that he would not have handled a relevant transaction in the way that it apparently appeared *101 on the corporate books. [3] Considering the size and complexity of the corporate operation, we are convinced the corporate records were not adequate even to show its own income and still less to evidence that of Joseph. One of the most fertile areas in which to discover a concealment of relevant transactions in a mercantile corporation is the physical inventory. The purchase and sale of inventory items for cash, which might not appear in the records of the corporation and which might not even result in taxable income to the corporation, cf. Lela Sullenger, 11 T.C. 1076 (1948), could well be a likely source of receipts by Joseph. This is especially true for that part of the period during which *102 price controls were still in effect. Yet there is no evidence that petitioner's accounting witness examined the physical inventories nor, indeed, that he could have done so, many years after the event. See, e.g., Estate of Millie Langley Wright, 43 B.T.A. 551, 552 (1941). Finally, it is contended on the basis of the testimony of the same witness that the corporate operations were too small to result in such amounts of income as are attributed to Joseph. But the record shows that by 1943 the gross sales of the corporation had exceeded the million dollar mark and Joseph testified that business was increasing and required even larger amounts of capital than were then available. On the entire record we think it inescapable that neither the corporate accounting system nor its potential profits eliminated it as a likely source of the demonstrated increases in Joseph's net worth. In sum, the Government has sustained its burden of proving fraud as to Joseph and Lillian by making out a prima facie case of unreported income by means of the demonstrated increases in petitioners' net worth. Large amounts of income received and not reported for each of the years involved are thus *103 shown to have been received by petitioners even if we assume that their living expenses were negligible. The unexplained receipts and failure to report income in such large amounts is prima facie evidence of fraud. Holland v. United States, 348 U.S. 121 (1954); Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959), affirming 29 T.C. 1157 (1958), certiorari denied 361 U.S. 874; Gatling v. Commissioner, 286 F. 2d 139 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court; United States v. Johnson, 319 U.S. 503 (1943); Bond v. Commissioner, 232 F. 2d 822 (C.A. 4, 1956), affirming a Memorandum Opinion of this Court, certiorari denied 352 U.S. 878. A likely source of the income, Holland v. United States, supra at page 138, appears to be the corporation of which Joseph was the unsupervised executive. But, even though we are required to find, as will subsequently appear, that respondent has not sustained his burden of proving fraud on behalf of the corporation and even if it should be thought for that reason that the corporation should not be considered as the likely *104 source, respondent has gone further and negatived any other nontaxable derivation of the unreported income. United States v. Massei, 355 U.S. 595 (1958). The only explanation offered to rebut the prima facie showing by respondent was Joseph's testimony, which we regard as totally unreliable, both because of inherent contradictions and inconsistencies and for the reason that his conviction of a felony makes it unnecessary to assume that his testimony was truthful. Lillian Kilpatrick, supra; Chesbro v. Commissioner, 225 F. 2d 674 (C.A. 2, 1955), affirming per curiam 21 T.C. 123 (1953), certiorari denied 350 U.S. 995; Abraham Galant, supra. There are other indicia of fraud, as will presently appear. The record reveals that respondent's agents gave petitioners every opportunity to make a full disclosure of their assets and liabilities and their non-deductible personal expenditures. Pursuant to a request from respondent's agents, Joseph filed an affidavit in June of 1950 which purported to list the assets and liabilities of Joseph and his family as of January 1, 1945 and December 31, 1945, 1946, 1947, and *105 1948. In August of 1950, in response to respondent's request, Joseph provided a breakdown of certain categories of the previously listed assets and stated that he and his family had no living expenses during the taxable years. In January of 1951 Joseph amended his previous financial statements by adding three additional assets. Nevertheless, many items now stipulated were never disclosed by Joseph but were uncovered as a result of the investigations of respondent's agents. As to some of the discovered items, the parties have stipulated the amounts thereof; as to other items, the parties disagree as to the propriety of their use in the net worth computation or as to their amount, or both. Petitioners listed checking or savings accounts only at the Bank of Athens Trust Company in New York, N. Y., and at the First National Bank in Greenwich, Connecticut. In addition, respondent's agents discovered family checking and savings accounts at the Bank of the Manhattan Company, the Dime Savings Bank of Brooklyn, and the Greater New York Savings Bank. Respondent discovered 17 separate checking or savings accounts at these five banks in the names of Joseph, his wife, his children, or in trust *106 for his children. Three bank accounts in Joseph's name were maintained continuously during the taxable years but only one of these accounts was listed with respondent. The remaining 14 bank accounts were maintained continuously during only a part of the taxable years, the four accounts at the First National Bank in Greenwich being opened during 1947. We have found that the bank accounts in the name of petitioners' children and the bank accounts held in trust for the benefit of their children were not assets of the petitioners, and accordingly the December 31 balances in such bank accounts have been excluded from the net worth computation of the petitioners. Petitioners listed $12,000 of Government bonds as being owned by them during the period January 1, 1945 through December 31, 1945 without specifying the type of Government bonds held. Respondent's agents ascertained that Joseph bought $47,000 of Treasury bonds, 1967-72, by cash subscription during 1945 and $2,000 of such bonds in a joint purchase of a $5,000 bond with Antonio Di Salvo in June 1945. Joseph denied owning or ever having owned Treasury bonds of this issue. He testified that the various purchases making up the $49,000 *107 total were for relatives. According to Joseph, the $25,000 of bonds purchased on May 29, 1945 at Gimbel's department store was bought and paid for by the Rinelli family; the $10,000 of bonds purchased on June 1, 1945 at the Manufacturers Trust Company was purchased for his uncle Joseph with his uncle's funds; the $7,000 of bonds purchased November 15, 1945 were individual $1,000 bonds for various members of his family; the $5,000 of bonds also purchased November 15, 1945 were bought by his father and mother with their own funds; and the $2,000 of bonds purchased with and through Di Salvo was bought with cash from the Rinelli family. There is no corroborating testimony or documentary evidence to support Joseph's testimony. No member of the Rinelli family nor of his family testified to purchasing any such bonds. Furthermore, respondent produced two checks dated May 29, 1945 drawn by the corporate petitioner in favor of Gimbel's which total $25,000. These checks were not otherwise explained and the inference is clear that the corporate petitioner paid for the $25,000 of bonds delivered to Joseph. If the Rinelli family reimbursed the corporate petitioner for the purchase and took over *108 the bonds as family property, some member of the family could presumably have so testified. Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). We are unable to believe Joseph's uncorroborated testimony as to any of these Treasury bond purchases. Lillian Kilpatrick, supra.Accordingly, we have found as a fact that Joseph owned the $49,000 face amount of United States Treasury bonds, 1967-72, from the dates of purchase through December 31, 1949. In addition to the bonds already described Joseph and Lillian purchased and held United States Government savings bonds, Series E, of various denominations throughout the taxable years. At the criminal trial, the Government produced evidence showing the name and address of the owner at the time of issue. Using this evidence, Joseph testified separately as to each of the Series E bonds listed in our findings. He specifically testified that certain bonds were purchased by him and as specifically denied purchasing other bonds. Except for denying that he purchased or owned certain of the bonds issued to him as owner, Joseph has made no effort to prove that such bonds *109 were owned by the other party named on the bond when issued. His uncorroborated testimony is insufficient to overcome the proof that such bonds were issued to him initially as owner. Lillian Kilpatrick, supra.We have accordingly concluded that Joseph and Lillian owned Series E bonds in the amounts set forth in our findings. The cumulative totals of their holdings at December 31 for each of the years 1944 through 1949 has been included in their net worth computation. For clarity, we compare in the margin the findings requested by the parties on brief with our findings as to the Series E bonds owned by petitioners at December 31 of the stated years. [4]
The parties agree as to the amounts that petitioners invested *110 in the capital stock of Sclafani Brothers, Inc., Sclafani Wine Corporation, and the corporate petitioner, and to the amount of a deposit with Vitas Packing Company. They also agree as to the amount but not the includibility of investments in Smith Street Dock Corporation and in Rinelli Realty Corporation. The latter assets were included by petitioners in their financial statement to respondent's agents in 1950, but Joseph now contends that Lillian acquired her stock in Smith Street Dock Corporation and Rinelli Realty Corporation by gift from her father, and that accordingly they should not be included in his personal net worth statement, nor should her other assets, liabilities, and nondeductible personal expenditures. We cannot agree. Petitioners filed joint income tax returns for the taxable years 1945 through 1949 and the income and deductions of both were included therein. The statutory notice was issued to both petitioners and each of them executed the petition filed in this case. The financial statement submitted to the respondent's agents in June of 1950 included the assets of both. The argument appears to be an afterthought based upon the unexplained failure of Lillian to *111 appear or be represented at the trial, but it has no validity because we are concerned with the net worth of both petitioners in order to determine whether there were annual excesses of their joint income over that reported. I.R.C. 1939, section 51(b); Dora S. Hughes, 26 T.C. 23 (1956); Hyman B. Stone, 22 T.C. 893 (1954). Petitioners included no stock investment in Violet Packing Co. among the assets listed in their financial statement to respondent. After investigating the circumstances under which Joseph acquired $10,000 of capital stock in the latter company in 1946 and another $1,000 investment in 1947, respondent included such stock in petitioners' assets for net worth purposes. Petitioners contend that Joseph obtained his stock in Violet Packing Co. as a gift and not by investment on his part. The evidence will not support petitioners' contention or Joseph's testimony that he acquired the Violet Packing Co. stock as a gift. Joseph was one of the original subscribers to the capital stock of Violet Packing Co. and agreed to pay $10,000 for 100 shares. As president of the corporate petitioner, he caused it to pay $60,000 over to Violet Packing Co.; *112 as president of the latter, he caused it to issue $60,000 of capital stock which went to the original subscribers. Later, and in March, April, and May of 1946, an additional $20,000 of Violet Packing Co. stock was issued for cash. By the end of May 1946, Violet Packing Co. had issued the $80,000 of capital stock provided for in the minutes of the first meeting of its incorporators and subscribers, and Joseph received one of the 100-share certificates that were issued under date of January 2, 1946. While it is clear that the corporate petitioner provided Violet Packing Co. with $60,000 on February 15, 1946, it is of no consequence whether the corporate petitioner was reimbursed for Joseph's share. The cash disbursements book of the corporate petitioner shows that the $60,000 was charged to the "exchange account." Between August 19 and November 6, 1946, inclusive, 10 collection reports with matching deposit acknowledgments from the bank were credited to the exchange account to balance the $60,000 charged thereto on February 15, 1946. If any part of these represented collection funds belonging to the corporate petitioner, which it should have received in any event, the Violet Packing *113 Co. stock was to that extent a surreptitious distribution. If not, and Joseph repaid the corporate petitioner for the stock he received, he must have had the funds to do so. In either event, the addition to his net worth is inescapable. The purchase of Vitas Packing Company required an initial payment of $55,000 and a later payment of over $7,000, which more than exhausted the $60,000 cash acquired by Violet Packing Co. from the corporate petitioner. If the corporate petitioner received repayment it was exactly $60,000 in cash, which leaves no margin for gifts. The remaining $20,000 of stock was issued for cash according to the books and records of Violet Packing Co., which means that its capital stock was issued solely for cash. The evidence contra consists solely of Joseph's uncorroborated testimony that the stock was a gift to him from some undisclosed donor. We agree with respondent that the Violet Packing Co. stock should be included in petitioners' net worth computation. On their financial statement of June 1950, petitioners informed respondent that they had "Other loans" of $35,000 at January 1, 1945, $60,000 at December 31, 1945, and $28,000 at December 31, 1946. Petitioners *114 explained the $35,000 loan was for advances to Riverbank Canning Company of California prior to January 1, 1945, which increased to $50,000 during 1945, all of which was repaid in 1946. In addition, petitioners informed respondent that they advanced $10,000 to Florida Grapefruit Canning Company during 1945, which was repaid in 1946. The petitioners also informed respondent that the $28,000 item at December 31, 1946 was for purchase invoices paid for the corporate petitioner and refunded to them in 1947. As to the latter item, petitioners explained that when "foods were decontrolled in November 1946 and prices tumbled," the invoices were paid personally to retain the corporate petitioner's bank credit without entering the advances on the corporate books. Respondent included these amounts in computing petitioner's net worth. Joseph's financial statement of June 1950 showed an increase in the loans payable to him by the corporation from $26,428 at the end of 1946 to $118,952.28 at the end of 1947. Respondent's investigation of this $92,524.28 increase revealed that 26 checks of the corporate petitioner, fotaling approximately $149,000 had been made out to"Cash," except one to Joseph *115 individually, and were entered on the cash receipts and disbursements book as disbursements to specifically named creditors. Joseph's explanation that the $149,000 represented repayments of sums he had previously advanced to the corporate petitioner was rejected by respondent as incredible. Respondent contends that Joseph caused the corporate petitioner to distribute these amounts to himself and that the distributions were constructive dividends taxable to him. Part of Joseph's explanation dealt with an asset listed in petitioners' financial statement of June 1950, namely, cash on hand in the amount of $100,000 at January 1, 1945 and $70,000, $80,000, $10,000, and $12,000 on December 31, 1945, 1946, 1947, and 1948, respectively. The explanation in the financial statement was, "Received $125,000 cash from Peter Rinelli, my father-in-law in 1938." The facts as to this have already been summarized in the quotation from United States v. Sclafani, supra. In the absence of corroborating evidence, it is impossible to accept Joseph's testimony that his father-in-law gave him a gift of $125,000 in cash. Lillian Kilpatrick, supra. If Rinelli was providing for the *116 future of his family, as Joseph testified, it is incredible that he would fail to mention his plans to his wife, his daughters, or his blind son. Peter Rinelli kept his family group intact and, as his daughters married, their husbands were brought into and became a part of the Rinelli household. Although Josephine Rinelli is dead, her daughters, her son, and her other son-in-law survive. No reasons appear of record why they could not have testified as to Peter Rinelli's financial condition and as to his intentions of making provision for his wife and children. Wichita Terminal Elevator Co., supra.We agree, therefore, with the respondent that this record does not justify a finding that Peter Rinelli made a gift of $125,000 to his son-in-law, or that Joseph had $100,000 or any part of such alleged gift remaining in his possession at January 1, 1945, which could be used as a part of his opening cash in a net worth computation. No dispute exists as to the receipt of the $149,115.33 by petitioners in 1947 from the corporate petitioner or that approximately $132,000 of this sum was thereafter deposited to the credit of the corporate petitioner of which about $92,000 was *117 traced by respondent's agents into the $118,925.28 owed petitioners by the corporation at December 31, 1947. Additional documentary evidence and testimony were adduced by petitioners in this Court in an effort to establish that when the corporate petitioner issued the 26 checks in 1947 it was merely reimbursing Joseph for equivalent sums of money that he paid out for its benefit in 1946 and that the sums involved were not corporate distributions to Joseph taxable as constructive dividends. Petitioners produced checks drawn by Joseph on his personal account with the Bank of Athens Trust Company in payment of 14 purchase invoices and he explained payment of two other invoices by showing a charge by the Bank of Athens Trust Company of the amount of the invoices against his personal account. The total amount withdrawn from Joseph's personal account in payment of merchandise purchased for the corporate petitioner between September 10 and December 31, 1946 was $57,517.39. During September and October 1946 the corporate petitioner issued checks on its account at the National City Bank of New York in payment of five invoices which Joseph claims were paid for with his personal funds. The *118 total amount of the invoices was $45,577.91, and the corporate checks issued in payment for the invoices were numbered 48, 49, and 50 and were dated September 23, October 4, and October 11, 1946, respectively. As proof of the fact that he paid these five invoices, Joseph produced collection reports and matching deposit slips from the National City Bank of New York which show that at or about the time the corporate petitioner issued checks 48 and 49 funds requisite to meet the checks were deposited with the Bank. Joseph testified that the funds so deposited were his personal funds deposited for the specific purpose of paying three of these invoices. Joseph relies on the ledger sheets of the National City Bank of New York to establish that he provided the funds for the issuance of check 50 for two invoices. The record shows that collection report 751, dated September 24, 1946, with "Exchange" marked in the "Name of customer" column, reported $2,922.42 as the amount of net cash which was entered in the "General" column. Stapled to the collection report is a duplicate deposit slip from the National City Bank of New York acknowledging the receipt of $2,922.42 for the account of the *119 corporate petitioner on September 24, 1946. Similarly, collection report 752, on the same date, reported $9,968.87, and stapled thereto was a duplicate deposit slip from the bank acknowledging the receipt of $9,968.87 for the account of the corporate petitioner. The two deposits total $12,891.29, which is exactly the amount of the check (No. 48) the corporate petitioner issued to D. J. Salomone Company covering two invoices which also totaled $12,891.29. Under date of October 4, 1946, the corporate petitioner drew check 49 on its account at National City Bank of New York.The check was payable to Chase National Bank in the amount of $22,320.15 and was for the purpose of taking up a draft for merchandise drawn on the corporate petitioner by Parrott & Company which Chase National Bank held for collection. Petitioners produced three collection reports with matching deposit slips, dated October 4, 1946. Each collection report, viz., 782, 783, and 784, was marked "Exchge," gave Parrott as the name of the customer, and reported a total of $22,320.15 in the "General" column. Under date of October 11, 1946, the corporate petitioner drew check 50 on its account at National City Bank of New *120 York for $10,366.47 in favor of D. J. Salomone Company covering two merchandise invoices dated October 7, 1946. The ledger sheets of the corporate petitioner's account at such bank show that this check was charged against the account on or about October 16, 1946, that various deposits were credited to the account between October 11 and 16, as well as other checks being charged against such account, but no evidence with regard to such deposits was produced which would indicate the source of the deposits. The ledger sheets aforementioned reflect the charges against the account for checks numbered 48 and 49 and credits to the account for matching deposits with collection reports 751, 752, 782, 783, and 784. Examination of the matching deposit slips reveals a large number of small items were included in each deposit except the matching deposit with collection report 752. Joseph testified that these numerous small checks as well as the larger amounts included in these deposit slips represented his personal funds. Except for the testimony covering the method of operation used by the salesmen-collectors in sending in their collection reports and matching deposits, there is no corroboration *121 of Joseph's statement that these amounts were his personal funds rather than collections of accounts for merchandise sold. We cannot accept Joseph's uncorroborated testimony that his personal funds were used by the corporate petitioner in issuing its checks numbered 48, 49, and 50. Lillian Kilpatrick, supra. The final group of invoices relates to bank and sight drafts aggregating $52,957.18 drawn on the corporate petitioner through various banks which Joseph claims he paid for with his own funds. Joseph testified with regard to the bank holding the draft and that he paid each with his personal funds. There is no corroboration of this testimony and without supporting evidence we cannot accept Joseph's dogmatic assertions as true. In their financial statement in 1950 petitioners informed respondent that their real estate consisted of a house located in Greenwich, Connecticut, which they valued at $11,500 at January 1, 1945 and at December 31 of each of the years 1945, 1946, 1947 and 1948. Actually, Lillian owned no interest in this property at January 1, 1945, since it was purchased in September of that year. It is clear from the facts of record that petitioners omitted *122 from their financial statement Lillian's interests in the family home at 8312-19th Avenue, in the $22,500 mortgage taken from the purchasers upon the sale of a portion of such property in 1947, and in the property remaining at 8312-19th Avenue after the 1947 sale. The additional real property interests were discovered as a result of the investigations made by respondent's agents, and the fact that petitioners have stipulated the values thereof for net worth purposes does not justify the concealment of these properties when petitioners were interrogated by respondent's agents as to their assets and liabilities. In their original financial statement petitioners listed under securities and investments only the stocks held by Lillian in Smith Street Dock Corporation and Rinelli Realty Corporation. Early in 1951, and after conferences with respondent's agents, Joseph amended the financial statement to include 100 shares of stock in Trans America acquired in 1934 at a cost of $400 and 100 shares of Consolidated Gas purchased about 1936 for $1,150. In addition to these items, respondent's agents discovered that Joseph had invested in Maguire Industries, Inc., Investors' Diversified Services, *123 additional shares of Consolidated Gas, some riding horses, automobiles, [5] and a tractor. The amounts of these various investments as to each taxable year are stipulated. These assets were brought to light primarily by respondent's investigations and not because of any voluntary cooperation on the part of the petitioners. The parties have stipulated that liabilities existed during the taxable years and the stipulated amounts have been taken into account in computing petitioners' net worth for each of the taxable years. Petitioners listed three insurance policies covering Joseph's life in their original financial statement and added one by their 1951 amendment. The premiums paid on three of these policies aggregated $894.17 a year for 1945, 1946, and 1947 and $991.61 a year in 1948 and 1949, after a policy was taken out in 1948. Respondent's agents uncovered 10 additional insurance policies on the lives of Joseph and *124 his children which had been omitted from petitioners' financial statement. The parties stipulated the total amount of petitioners' personal expenditures for insurance premiums during the taxable years and the stipulated premiums exceeded the premiums on the policies listed by petitioners by the following amounts: [6] 1945 - $1,217.06; 1946 - $1,511.46; 1947 - $1,417.06; 1948 - $1,511.46; 1949 - $1,417.06. Seven of the 10 policies omitted by Joseph from the financial statement, as amended, were with Prudential Life Insurance Company. In view of the aggregate amount of premiums paid Prudential in each of the taxable years, it seems unlikely that Joseph could have failed to include these insurance policies in listing his assets except to avoid disclosure of the expenditures for premiums. Although requested by respondent to provide him with information regarding their personal expenditures, the only amounts disclosed by petitioners were the premiums on three insurance policies in the June *125 1950 statement. The stipulated facts include numerous expenditures by petitioners during each of the taxable years, some of which were deductible and some nondeductible items. Joseph seeks to exclude many of the stipulated amounts from his net worth computation because they were his wife's as distinguished from his personal expenses. As to other items, he testified that they were his personal expenditures. We have already concluded that the net worth computation for each taxable year must include the assets, liabilities, and personal expenditures of both petitioners, regardless of whether Lillian elected to prosecute her petition, and their combined income has been so computed. The parties were unable to stipulate the amount of petitioners' personal expenditures for food, clothing, and entertainment. Respondent estimated petitioners' expenditures for food, clothing, and entertainment as $3,000, based upon the investigation of his agent. Joseph stated in 1950 that food and shelter for his family was provided by the Rinelli family. He so testified at the trial and that his children's clothing was provided by their grandparents. Joseph made no affirmative statement as to entertainment, *126 as to the clothing provided for himself and Lillian, or that Peter and Josephine Rinelli died prior to 1945 and were unable to provide food and shelter for Joseph's family. In 1945, petitioners' son and daughter were 13 and 12 years of age, respectively, and their personal needs with respect to food, clothing, and entertainment were increasing each year. Under the known facts, petitioners' contention that they had no expenditures whatever during these five taxable years for a family of four, including two teen-age children, is incredible. The evidence will not permit such a finding. The alternative is to accept respondent's estimate or scale it down on the basis of evidence or judicial notice. The amount being reasonable, and there being no other evidence, we have found that petitioners' personal expenditures for themselves and their family during each of the taxable years for food, clothing, and entertainment was not less than $3,000 a year. Finally, we are unable to accept petitioners' belated resort to the James case. [7] We find no evidence lending the remotest suggestion of embezzlement to the undisputed facts. Whatever Joseph did, he had the boundless and unswerving approval *127 of the other interested parties. Under facts comparable to those present here, the conclusion would not have been that there was an embezzlement even before the James case. W. L. Kann, 18 T.C. 1032 (1952), affd. 210 F. 2d 247 (C.A. 3, 1953), certiorari denied 347 U.S. 967. Once fraud has been shown and the bar of the statute of limitations thereby removed, the burden is on petitioners to show that the deficiencies were erroneous. In Leonard B. Willits, 36 B.T.A. 294, 300 (1937), we said: * * * Petitioner contends that as respondent has the burden of proving fraud - in order to prevent the tolling of the statute of limitations as to the year 1925, and in order to justify the imposition of the 50 percent additional tax as to each year - the burden is shifted so as to require him to prove that deficiencies in tax existed. This contention is without merit. While respondent has the burden of proof of fraud, if he is successful in establishing that fact the presumption of correctness of his determination of deficiencies thereupon immediately revives and must be overcome *128 by positive evidence on the part of the petitioner. The statute of limitations does not shift the burden of proof; it merely raises a bar to the assertion by the respondent of any claim for a deficiency in tax; and, once that bar has been removed by proof of fraud, we are where we were before. Cf. L. Schepp Co.[25 B.T.A. 419 (1932)]. Petitioners have not borne their burden, but our findings on the deficiencies are based on the entire record and do not depend solely on the burden of proof. At the hearing, Lillian Sclafani in Docket No. 65418 not having appeared, respondent moved for judgment against her, such judgment to be in accordance with the decision reached by the Court in this case. The motion was taken under advisement to be acted upon in connection with the disposition of the other cases. Due consideration having been given to the motion in connection with the disposition of this case, the motion is hereby granted, Arthur N. Dellit, 24 T.C. 434 (1955); Myrna S. Howell, 10 T.C. 859 (1948), affirmed per curiam 175 F.2d 240 (C.A. 6, 1949); Meyer J. Safra, supra, and in the proceeding as to Lillian judgment *129 will be entered accordingly. Since respondent has conceded error as to the additions to tax under section 294(d)(2), I.R.C. 1939, decision will be entered as to both petitioners under Rule 50. Joseph L. Sclafani Docket No. 88034. For the calendar years 1955 and 1956 respondent determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1954 as follows: Additions to tax
Sec. 6653(a),
Year
Income Tax
I.R.C. 1954
1955
$15,761.94
$788.10
1956
15,464.73
773.24
The questions presented are (1) whether petitioner derived dividends and other income from Joseph L. Sclafani, Inc., in the amount of $37,660.65 for 1955 and $37,316.71 for 1956; (2) whether the 5 percent additions to tax for negligence under section 6653(a), Internal Revenue Code of 1954, were proper; and (3) whether the statute of limitations bars assessment and collection of the deficiencies. The item of other income constitutes $32,000 of the 1955 total and $15,000 of the 1956 total. Findings of Fact During the taxable years Joseph L. Sclafani and his wife Lillian resided at Oakley Lane, Greenwich, Connecticut. *130 They timely filed their joint income tax returns for the taxable years with the district director of internal revenue at Hartford, Connecticut. They reported adjusted gross income of $10,606.97 for 1955 and $12,316.76 for 1956. At January 1, 1955 the amount of Joseph's loans to the corporate petitioner was unchanged from December 31, 1949. During 1955, the corporate petitioner reduced the amount owed Joseph by paying him $17,000 in March and $15,000 in June. During 1956 the corporate petitioner paid $5,000 on the indebtedness in February and $10,000 in April, but later in 1956 Joseph loaned the corporate petitioner $12,000, with the result that the balance on December 31, 1956 was reduced by no more than $3,000. In determining the deficiencies for 1955 and 1956, respondent increased Joseph's income by the $32,000 paid in 1955 and by the $15,000 paid in 1956 and explained his adjustment as follows: "To adjust income for amounts withdrawn from Joseph L. Sclafani, Inc., by Joseph Sclafani." During 1955 the corporate petitioner paid $660.65 to an accounting firm for accounting work which had no connection with Joseph's criminal or civil trials. It is stipulated that such sum should *131 be excluded from the legal and accounting fees of $5,660.65 which respondent determined to be dividend income because paid by the corporate petitioner for the benefit of Joseph. During 1956 the corporate petitioner paid $2,536.24 which the parties stipulate should be excluded from the $22,316.71 determined by respondent to be dividend income to Joseph. During 1959 Anthony A. Marcelle, an attorney, was paid $5,000 by the corporate petitioner for legal and accounting services in connection with the criminal prosecution of Joseph. In preparing for Joseph's criminal trial, the work done was much the same as would have had to be done in preparing for a civil trial, and the great bulk of the work was done in relation to the books and records of the corporate petitioner. In 1956 the corporate petitioner paid certain additional expenses in connection with the criminal prosecution of Joseph aggregating $12,292.55 as follows: $4,168.40
for a transcript of the stenog-
rapher's minutes in the criminal
trial of Joseph, which would also
be available for any civil trial;
$2,500.00
legal fees to Harold I. Cammer,
who assisted in criminal trial;
$ 326.93
for photostats used in the crim-
inal trial;
$ 297.22
to Sol Alpert, an accountant who
aided in preparation of the case
for criminal trial;
$5,000.00
to Anthony A. Marcelle (March
1956) for legal and accounting
services during the criminal trial.
*132 In determining the deficiencies for 1955 and 1956, respondent included $5,660.65 in 1955 and $22,316.71 in 1956 in Joseph's income for the respective years as dividend income because of legal and accounting fees paid by the corporate petitioner for the benefit of Joseph. The payments in connection with the criminal trial were expenses of Joseph and payment thereof by the corporate petitioner, except as to the excluded amounts stipulated for each year, represented corporate distributions to Joseph. Consents fixing a period of limitation upon the assessments of Joseph's 1955 and 1956 income taxes were executed by the parties. The 1955 consent was received by respondent on March 17, 1959 and extended the time to July 31, 1959. The 1956 consent was received by respondent on March 8, 1960 and extended the time to June 30, 1960. The deficiency notice herein was addressed to "Mr. Joseph L. Sclafani and Mrs. Lillian Sclafani, Husband and Wife." It is dated April 14, 1960. Opinion Timely returns were filed by Joseph and Lillian for the taxable years 1955 and 1956. Subsequently the 3-year period of limitations for assessment and collection of the deficiencies was extended to July 31, 1959 for *133 the taxable year 1955 and to June 30, 1960 for the taxable year 1956. No fraud is involved. The deficiency notice was issued April 14, 1960, which was after the expiration of the period as extended for 1955 and prior to the expiration of the period as extended for 1956. Assessment and collection of the 1955 deficiency, therefore, is barred under section 6501(a) of the 1954 Internal Revenue Code, [8] unless, as respondent contends, the 1955 deficiency is timely because of the provisions of section 6501(e) of the 1954 Code [9] and because Joseph omitted from his 1955 gross income an amount in excess of 25 percent of the amount of gross income stated on his tax return. Respondent contends that over $37,000 was omitted from gross income. Gross income of $10,606.97 was reported on the tax return. Petitioner concedes that if section 6501(e) is applicable, the deficiency notice was timely. Its applicability depends on whether income was actually omitted. *134 The $37,000 which respondent contends was omitted from Joseph's 1955 return consists of $32,000 paid Joseph by the corporate petitioner and $5,000 paid to Anthony A. Marcelle, an attorney, for legal and accounting services in connection with the criminal prosecution of Joseph. In determining the deficiency, respondent treated the $32,000 as other income and the $5,000 as dividend income because of fees paid by the corporate petitioner for the benefit of Joseph. The evidence shows that the corporate petitioner paid Anthony A. Marcelle $5,000 in 1955 for legal and accounting services in connection with Joseph's criminal prosecution. Petitioner contends that, since the work done on the criminal case was done with the civil liability in view and since 90 percent of the work was done in relation to the corporate petitioner's books and records, the costs for legal and accounting fees should be apportioned between the civil and criminal aspects. We are not persuaded by this argument. It may well be that after deficiency notices were sent to the corporate petitioner in 1960 and 1961 the accounting and legal work previously done on the corporate books and records in Joseph's criminal *135 trial was helpful. But this is not the situation that existed in 1955. The problem then was Joseph's approaching criminal trial, his lack of books and records, and resort to the corporate books and records to support Joseph's testimony. Even if counsel had been completely aware of the civil aspects of Joseph's entanglement with the Treasury Department and some of the $5,000 had been paid in connection with such civil aspects, the amount would still have been paid for Joseph's benefit and because of his obligations. Frank J. Matula, Jr., 40 T.C. - (Sept. 3, 1963). The payment satisfied no obligation of the corporate petitioner. We view respondent's treatment of the $5,000 paid to Marcelle as correct, and petitioner consequently omitted from gross income an amount of income which was properly includable therein. Since this amount is in excess of 25 percent of the gross income stated on Joseph's 1955 tax return, respondent is entitled to the benefit of the 6-year period of limitations provided by section 6501(e) of the 1954 Code. David L. Zips, 38 T.C. 620 (1962); Emanuel Hollman, 38 T.C. 251 (1962). As to the remaining $22,316.71 ($37,316.71 less $15,000) which respondent *136 determined was dividend income to Joseph in 1956, the parties have stipulated that $2,536.24 should be excluded therefrom. This leaves $19,780.47, and the parties now stipulate that the corporate petitioner "paid legal and accounting fees during 1956" in this amount "in connection with the criminal prosecution of Joseph L. Sclafani and in connection with the Federal tax liability" of the corporate petitioner. Whether the legal and accounting fees were paid for Joseph's benefit or to meet the corporate petitioner's obligations for accounting and legal fees is a question of fact. Counsel for Joseph and the corporate petitioner testified at length about the several expenditures. We have found the amounts paid to various persons and the services for which the expenditures were made. The expenditures which were paid by the corporate petitioner for the benefit of Joseph are listed and described in our findings. Each of these expenditures represented corporate distributions to Joseph and we have so found. The total thereof is $12,292.55 and this portion of the stipulated amount [10] of $19,780.47 constituted dividend income to Joseph in 1956. *137 Although the deficiencies for both years were timely, the amounts determined appear to be excessive. In 1955 the corporate petitioner paid Joseph $32,000 and $15,000 in 1956. We have found that these amounts were not corporate distributions but were repayments of loans previously made by Joseph and due him from the corporation. In the recomputation, the gross income for these two years should be reduced by these respective amounts. As to the additions to tax for negligence, petitioners offered no evidence and limit their contentions to the statement that "if * * * the Commissioner is wrong in his deficiency assessments against Joseph for the years 1955 and 1956, then the * * * negligence penalty * * * falls with the erroneous deficiency assessments themselves." The additions to tax under I.R.C. 1954, section 6653(a), are accordingly approved except for the requirement of an adjustment in their amounts in the computation under Rule 50. Joseph L. Sclafani, Inc. Docket No. 92200 For the calendar years 1945 through 1949, respondent determined deficiencies in income, declared value excess profits, and excess profits taxes and additions to tax for fraud under *138 92 the Internal Revenue Code of 1939, as follows: Income Tax
Additions to tax
Sec. 293(b)
Year
Deficiencies
I.R.C. 1939
1945
$13,124.91
$ 6,562.46
1946
$34,226.53
$17,113.27
1947
43,335.32
21,667.66
1948
9,643.65
4,821.83
1949
13,322.75
6,661.38
Declared Value
Excess Profits Tax
Excess Profits Tax
Addition to tax
Addition to tax
Sec. 293(b)
Sec. 293(b)
Year
Deficiency
I.R.C. 1939
Deficiency
I.R.C. 1939
1945
$10,691.37
$5,345.69
$40,806.48
$20,403.24
The questions presented are (1) whether respondent erred in determining that petitioner's net income as disclosed by its returns should be increased for each taxable year by the total increases in net worth of five of its officers and stockholders for such taxable years; (2) whether the additions to tax for fraud are proper; and (3) whether assessment and collection of the deficiencies are barred by the statute of limitations. Findings of Fact Joseph L. Sclafani, Inc., is a corporation, organized and created on January 5, 1937 and existing under and by virtue of *139 the laws of New York. It is a wholesale grocery company supplying principally Italian groceries. For the taxable years 1945 through 1949 it timely filed its income tax, declared value excess profits tax, and its excess profits tax returns with the collector of internal revenue for the first district of New York. The corporate petitioner's volume of sales increased steadily from a 1937 low of $661,866 to a 1944 amount of $1,146,991. For the taxable years 1945 through 1949 the corporate petitioner's income tax returns show net sales, gross profits, deductions, net income, and income tax liability as follows (cents omitted): Gross profits
Gross
Percent
Net
Tax
Year
Sales
profits
of sales *
Deductions
income
liability
1945
$1,278,333
$ 97,249
7.6
$ 88,634
$8,808
$2,278
1946
1,179,065
88,515
7.5
86,295
2,219
466
1947
1,234,232
95,396
7.7
92,506
2,921
613
1948
1,595,963
103,911
6.5
105,696
9,548
2,096
1949
1,336,498
87,882
6.5
99,993
4,884
1,025
Prior to 1945, percentage of gross profits to sales ranged from 2.8 to 6.6. *140 The surplus and undivided profits of the corporate petitioner, as reflected in the balance sheets attached to the corporate tax returns for 1944-1949, inclusive, were as follows: December 31
Amount
1944
$13,398.42
1945
21,133.09
1946
20,212.02
1947
23,133.45
1948
29,971.97
1949
33,831.04
During the taxable years, and prior thereto, Joseph L. Sclafani commingled his private funds with the funds of the corporate petitioner. Joseph used his own assets and the funds turned over to him by his brothers and cousin to loan and advance funds to the corporate petitioner in the conduct of its business. Some of the funds withdrawn by Joseph from the corporate petitioner were for reimbursement of such loans and advances. All records of the corporate petitioner requested by the respondent were produced for inspection and examination. The cash receipts and disbursements book for 1945 and 1946 and the sales book for 1945 which were not produced and unavailable for examination and inspection prior to the criminal trial in 1956 were produced and submitted to respondent's agents prior to trial herein. The statutory notice of deficiency is dated February 16, 1961. *141 The only adjustment made by the respondent for each of the taxable years was to increase the net income disclosed by the returns by the following amounts of "additional income": Net income
Additional
Income as
Year
per return
income
corrected
1945
$ 8,808.80
$ 90,936.40
$ 99,745.20
1946
2,219.88
89,076.69
91,296.55
1947
$2,921.43
$112,733.38
$115,654.81
1948
9,548.09
26,753.27
36,301.36
1949
4,884.90
36,338.83
41,223.73
Total
$28,383.10
$355,838.57
$384,221.65
The explanation of the adjustment made for each taxable year by way of "additional income" is the same, and is as follows: "It has been determined that the total increases in net worth and expenditures of the individuals as shown below represent additional income realized by you and not reported on your income tax returns for the years indicated." Increase in Net Worth and Expenditures
1945
1946
1947
1948
1949
Joseph L. and Lillian
$84,228.42
$39,835.09
$ 80,458.07
$23,109.27
James J. and Rena
685.27
13,406.13
7,488.92
$ 6,448.17
4,678.99
Dominick L. and Rose
5,069.29
11,550.50
3,771.67
15,826.01
3,704.91
James V. and Flora F.
953.42
15,528.39
9,889.42
2,044.84
466.69
William M. and Rose
8,756.58
11,125.30
2,434.25
4,378.97
G.
Total additional
$90,936.40
$89,076.69
$112,733.38
$26,753.27
$36,338.83
income
*142 In a statement attached to the statutory notice of deficiency entitled "Statement of Surplus and Distribution," respondent computed the dividends distributed and the capital returned by the corporate petitioner to its five officer-stockholders to be as follows: Dividends
Return of
Total
Year
distributed
capital
distributed
1945
$ 44,771.95
$ 46,164.45
$ 90,936.40
1946
21,214.50
67,862.19
89,076.69
1947
49,085.15
63,648.23
112,733.38
1948
26,753.27
26,753.27
1949
13,062.92
23,275.91
36,338.83
Total
$128,134.52
$227,704.05
$355,838.57
No part of the deficiency for any taxable year was due to fraud with intent to evade tax; and petitioner did not file false and fraudulent returns with intent to evade tax. Opinion All income tax returns of the corporate petitioner for the taxable years 1945 to 1949, inclusive, were timely filed. The 3-year period of limitation for assessment and collection of a deficiency for any of such taxable years expired prior to or during 1953. Since the deficiency notice was issued February 16, 1961, assessment and collection of any of the deficiencies herein are barred unless fraud *143 is established. The deficiency notice and the answer reveal that the charge of fraud against the corporate petitioner is built upon respondent's determination that the net worth increases of each individual petitioner for each taxable year, as accumulated, represented additional income of the corporate petitioner which was not reported on its income tax returns and that the failure to report was due to an intent to evade and defeat the payment of corporate income taxes. Respondent attributed the net worth increases of the individual petitioners to their withdrawals from the corporate petitioner, and he attributed additional income to the corporate petitioner due to the availability of funds for such withdrawals by the individual petitioners. To carry his burden of proving fraud, respondent relies upon the individual petitioners' dominance over, participation in, and control of the corporate petitioner together with the conviction of Joseph. With this factual background, respondent should have been able to point out specific acts and transactions of the corporate petitioner that were fraudulent, yet his revenue agents were unable to testify to a single sale of merchandise that *144 was omitted from the corporate books or an overstatement of deductions on the corporate petitioner's income tax returns. The burden rests on the respondent to prove fraud by clear and convincing evidence. Arlette Coat Company, 14 T.C. 751 (1950). There are no such unexplained increases in net worth here as were relied on in the case against Joseph. Nor is there a complete absence of the taxpayer's books and records as in Joseph's case. While we may well be suspicious that all was not as it should be with the tax affairs of the corporate petitioner, conjectures or even suspicion do not take the place of evidence. Even any failure to cooperate with respondent's agents as to the corporate affairs is as readily explainable by Joseph's desire to conceal his own financial transactions as to conclude that the corporation had unreported taxable income which it fraudulently failed to disclose. On the whole record, and particularly that part which should be available to sustain respondent's burden, we find that proof of fraud as to the corporate petitioner is lacking. Respondent contends that the commingling of personal with corporate funds enabled the individual petitioners *145 to make the withdrawals from the corporate petitioner. He asserts that petitioners disregard the illegitimate business character of Joseph's use of his personal bank account for corporate purposes and the use of their purported accumulations by the other individual petitioners in conjunction with both personal and corporate business. He claims that petitioners assume in their arguments that the funds were commingled for legitimate corporate purposes rather than for the concealment of taxable income. The evidence establishes and we have found that Joseph was responsible for commingling personal funds with corporate funds; and that Joseph also withdrew funds from the corporation to repay the sums accumulated for the benefit of the other individual petitioners who testified that Joseph alone handled the financing of the corporate business. Joseph was able to explain some of the transactions questioned by respondent to our satisfaction and some he failed to explain fully. The various transactions are considered and disposed of in the parts of our opinions relating to the individual petitioners and need not be further discussed here, except the Riverbank Canning Company and the Florida *146 Grapefruit Canning Company loans. As to these loans, respondent stipulated that they were personal loans of Joseph, and we accept the stipulation. While we have agreed with respondent with respect to Joseph, we can find no basis, other than conjecture, for concluding that respondent has sustained his burden of imputing Joseph's fraudulent conduct to the corporate petitioner. And we have no evidence that the other officers agreed to, participated in, or condoned any fraudulent acts of the corporation. We are unwilling to infer agreement, participation, or condonation without some evidence, particularly in view of their express denials of any knowledge that corporate funds were being diverted. United Dressed Beef Co., 23 T.C. 879 (1955). In so holding, we have taken into account and carefully weighed the additional evidence adduced in these consolidated cases together with the testimony and documentary evidence in the criminal prosecution of Joseph. Upon the entire record we are unable to find clear and convincing evidence of fraud as to the corporate petitioner. In the absence of fraud, the deficiencies are barred and decision will be entered for the petitioner. *147 Joseph L. Sclafani, Inc. Docket No. 88031 For the calendar year 1956, respondent determined an income tax deficiency of $7,952.83. The question presented is whether respondent properly disallowed deductions of $22,316.71 claimed as legal and accounting expense. At the hearing, respondent conceded $2,536.24 of the total, leaving the amount involved $19,780.47. Findings of Fact Petitioner is a New York corporation with its principal office in Brooklyn, New York. It timely filed its income tax return for 1956 with the district director of internal revenue in Brooklyn, New York. Its tax return was filed on an accrual basis of accounting. During 1956 the corporate petitioner paid out the following sums for the purposes stated: $2,500.00
to Albert I. Schmalholz, Esq., who
was retained as counsel by the cor-
porate petitioner in April 1956 and
has continued as its counsel. This
payment had no connection with
Joseph's criminal trial. Schmalholz's
services in the latter trial were paid
for by the attorney then of record
who contracted therefor.
$4,168.40
for a transcript of the stenographic
minutes of the criminal trial. It was
realized when this transcript was or-
dered that it could also be used in
civil tax matters.
$2,500.00
to Harold I. Cammer, Esq., an attor-
ney who assisted in the conduct of
the criminal trial.
$326.93
for photostats used at the criminal
trial and also at the trial herein.
$297.22
to Sol Alpert, an accountant who ren-
dered services in connection with the
criminal trial and, until December
1960, was engaged in preparing for
the trial herein.
$5,000.00
to Anthony A. Marcelle, Esq., attor-
ney of record in the criminal trial,
which was paid in March 1956 for
legal and accounting services during
the criminal trial.
$5,000.00
to Anthony A. Marcelle, Esq., in De-
cember 1956, after the criminal trial
and pursuant to a contract which
Schmalholz arranged whereby Mar-
celle was to assist in the conduct of
the trial herein. The contract with
the corporate and the individual peti-
tioners provided for a $5,000 retainer,
$2,500 of which was paid during De-
cember and $2,500 accrued on the
books of the corporate petitioner.
*148 The legal fees paid to Schmalholz in 1956 and the fees paid and accrued to Marcelle in December 1956 aggregating $7,500 are deductible expenses of the corporate petitioner. The balance of the expenses enumerated, aggregating $12,292.55, are not deductible expenses of the corporate petitioner but represent distributions to Joseph. Opinion The issue is whether certain legal and accounting fees paid by the corporate petitioner in connection with its own tax liability and in connection with the criminal prosecution of Joseph are deductible. We considered the various fees in determining Joseph's tax liability for 1956 in Docket No. 88034. No useful purpose would be served in restating the evidence or factual circumstances. We have listed in our findings various expenditures by the corporate petitioner and the purpose for which made. Some of them duplicate expenditures listed in Joseph's case for 1956 but this is due to petitioner's argument that an allocation should be made as to the portion of the expenditure which benefited the corporate petitioner as well as Joseph. We are not persuaded that this argument is sound. After weighing the facts, we have found that $7,500 of the fees *149 paid in 1956 were deductible legal expenses of the corporate petitioner. The deficiency resulting from the balance of the expenditures is sustained and should be adjusted in a Rule 50 computation. Remaining petitioners With respect to the other 12 dockets herein, [11] which involve Joseph's brothers and cousin, it is respondent's burden to prove fraud, and in whatever years the statute of limitations would operate as a bar except for fraud there will be no deficiency unless fraud is shown. The sole ground upon which respondent can justifiably rest his case for the showing of fraudulent returns is proof by him of consistent and substantial understatements of income. In discussing the individual cases of each of the four remaining petitioners and their petitioner-wives we are required to deal with estimates and assumptions in addition to certain stipulated figures. We have *150 set out in the margin of the portion of the opinion devoted to each individual petitioner a table consisting of the stipulated figures and others as to which there was no stipulation but only evidence either on behalf of the respondent or of petitioner or both. Where the figures are stipulated or where the respondent's evidence, documentary or otherwise, supports his position, we have employed the resulting figures. In some instances, however, such as the expenses of food, clothing and entertainment for the respective petitioners and their families, there is no evidence except an unsupported estimate by respondent's agent. Since we regard this as inadequate proof, we have in those instances accepted the figures admitted by petitioners. In addition, and bulking large in the final results, the testimony of all petitioners, including Joseph, was that Joseph retained certain sums at January 1, 1945 which had been given to and were held by him as the property of his brothers and cousin. Since this testimony on the part of Joseph constituted an admission against his own interest, not only as a debtor of his relatives but because it adversely affected his own net worth statement and aided *151 the Government in proving its case of fraud against him, we have accepted those figures as being correct, even though his testimony may be otherwise unreliable. Showell v. Commissioner, 238 F. 2d 148, 152 (C.A. 9, 1956), reversing on other grounds 23 T.C. 495 (1954). The stipulated figures, adjusted where appropriate to conform with our findings, indicate that in some years gross income was underreported. But in a manner of instances the discrepancy is so small as to be negligible; in others underreporting in one year is accompanied by overreporting in some other year. Bearing in mind, first, that the net worth approach is at best an approximation; second, that our findings with respect to living expenses are, of necessity, no more than the best estimate possible based on the 20-year-old recollection of witnesses and a necessarily unsatisfactory record; and, third, that overreporting in any year is entirely inconsistent with a pattern or scheme to overreach the Treasury, we conclude that the result of these computations is totally inadequate to sustain respondent's burden of proving fraud by clear and convincing evidence as to any of the petitioners except *152 Joseph. An additional word needs to be said as to the years where the statute of limitations, for one reason or another, does not apply. Here we have made no reference to any net worth computation. Accepting the doctrine that the burden of proof is on petitioners and that no adequate evidence has been produced by them to sustain that burden, we have concluded that in those instances respondent's determination of the deficiency should be approved. This is so notwithstanding that in other years the burden may have been upon respondent. Leonard B. Willits, supra.
The statute of limitations was not raised in any way directly or by inference in the pleadings or at the trial in the following docket numbers relating to the respective petitioners and the years involved: docket 48972, James V., 1949; docket 54483, Dominick, 1947, 1948, and 1949; docket 54482, James J., 1947, 1948, and 1949; docket 48973, William, 1949. There is some doubt about dockets 39863, James V., and 39864, William, both 1948, but as will subsequently appear this is not material. As to those petitioner-years, we may not even under the principle of the Cutcliffe case [12] regard the statute of limitations *153 as in issue. There was nothing in the opening statement nor the discussion during the trial nor at any time before final briefs to put respondent upon notice that such an issue existed. If he had evidence to combat it such as waivers there was no occasion for it to be introduced. The cases cited by the petitioners are distinguishable. [13] In the Cutcliffe case the Court of Appeals held the question of limitations was fairly before the Tax Court and was a good defense, even though there was no affirmative plea. The opinion pointed out that in spite of the deficiency in the pleadings "both counsel and the court understood" that limitations was an issue to be tried along with the fraud issue. No such understanding exists here, for the Court pointed out at the conclusion of the hearing that it was not clear from the discussion that there was a statute of limitations question.[14] The Factor and Polizzi cases involved questions of pleading unrelated to the statute of limitations, while Signal Oil & Gas Co. is a transferee case. Rule 7 of the Rules of Practice *154 of this Court requires that clear and concise assignments of error and statements of fact be set forth in the petition. Petitioners' failure to plead affirmatively the statute of limitations as to the deficiencies for the taxable years 1947, 1948, and 1949 leaves those years open regardless of the fraud issue. United Business Corporation of America, 19 B.T.A. 809, 831 (1930), affd: 62 F. 2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635. We must accordingly conclude that as to those years the deficiencies may not be eliminated because *155 of any belated assertion that the deficiency notices were not timely. The burden accordingly being placed upon petitioners and there being no adequate evidence to counteract the presumption of correctness, the deficiencies must be approved. The fact is that as to four petitioner-years it would be a matter of indifference even though the statute had been pleaded. In the cases of James V. and William for 1948 the notice of deficiency, as will be explained in more detail subsequently, was timely. The statute of limitations had not run in any event. As to Dominick for the years 1947 and 1948, as petitioner now concedes, consents extending the period of limitation were executed. So that it is only for James V., William, and Dominick for 1949 and James J. for 1947, 1948, and 1949 that it is in fact necessary for repondent to insist that the statute of limitations does not apply. James J. Sclafani and Rena Sclafani Docket Nos. 92199 and 54482 For the calendar years 1945 through 1949 the Commissioner determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1939 as follows: Additions to tax
Docket
Sec. 294
Sec. 294
No.
Year
Income Tax
Sec. 293(b)
(d)(1)(A)
(d)(2)
92199
1945
$ 77.65
$ 38.83
None
None
92199
1946
676.97
338.49
$36.56
None
54482
1947
1,093.08
546.54
64.20
$38.52
54482
1948
990.04
495.02
53.38
32.03
54482
1949
566.52
283.26
15.21
9.13
*156 The issues presented for the various taxable years are: As to 1945 and 1946, whether the Commissioner erred in (1) determining that petitioners received dividends from Joseph L. Sclafani, Inc., in the respective amounts of $337.58 and $3,192.78, which amounts were arrived at by use of the net worth and expenditures method, and (2) determining additions to tax for (a) fraud for both years and (b) failure to file a declaration of estimated tax for 1946; As to 1947, 1948, and 1949, whether the Commissioner erred in (1) determining that petitioners received certain distributions from Joseph L. Sclafani, Inc., in the respective amounts of $4,769.21, $5,300.42, and $3,234.92 which represent taxable dividends, (2) disallowing deductions for medical expenses for 1948 and 1949 in the respective amounts of $206.92 and $159.09, and (3) determining additions to tax for (a) fraud and (b) failure to file a declaration of estimated tax. For the taxable years 1945 and 1946 petitioners affirmatively raise the statute of limitations on assessment as a defense. Findings of Fact Petitioners James J. and Rena Sclafani are husband and wife. At all times pertinent to these proceedings they resided *157 at 1951-81st Street, Brooklyn, New York, and 186 Ann Street, Valley Stream, New York. For the taxable years 1945 through 1949 petitioners timely filed their joint income tax returns with the collector of internal revenue for the first district of New York at Brooklyn, New York. James J., a cousin of James V., Joseph L., Dominick, and William, petitioners herein, was born in 1916. He finished high school in 1934 and entered the employ of Sclafani Brothers, Inc., the same year. He lived with his parents on the second floor of 1951-81st Street, Brooklyn, New York, from about 1918 until married in 1941. The first floor thereof was occupied by his cousins and their parents. While living with his parents, he had no expenses for food, lodging, or clothing. In 1937 he was employed by Joseph L. Sclafani, Inc., at a salary of about $4,000. From 1937 to 1941 practically all his earnings were turned over to his cousin, Joseph, as they had been from the time he started working in 1934. Joseph doled out the money needed by James J., which was a small amount, and saved the rest of such earnings for the future. James J. had no brothers and he booked upon Joseph as his brother. James J. and *158 Rena were married on or about January 19, 1941. They had a church wedding and a reception. The wedding guests presented them with gifts of cash between $2,000 and $3,000 in addition to some checks. After their marriage James J. and Rena lived in a three-room apartment at 601-79th Street in Bay Ridge. The apartment rent was between $50 and $55 per month. They resided there until about November 1943, when James J. was inducted into the Army. Thereafter, Rena lived with her parents until James J. was released from the Army on March 17, 1946. While living with her parents, Rena had no expenses for board and lodging. Their first child, Jo Anne, was born in 1944. Shortly after induction, James J. was transferred to Camp Shelby, Mississippi, and assigned to the 65th Division, an infantry division. He remained at Camp Shelby for about a year and then was sent overseas to the European theater. There the 65th Division was a part of General Patton's Third Army which crossed France and Germany into Austria. At war's end James J. was in Linz, Austria. While her husband was in the Army, Rena received a monthly allowance or allotment, which exceeded $100 a month after the birth of their daughter. *159 James J.'s military pay over and above the portion allotted to Rena amounted to approximately $27 per month. Four or five dollars thereof was used for laundry and miscellaneous items and a portion of the balance was also sent to Rena in addition to her allotment. While with the Third Army, James J. sometimes failed to get paid because the Army moved too fast, with the result that his pay was ultimately received in a lump sum. He sent most of such lump sum payments home in money orders. During his service in the Army, James J. was paid a salary by Joseph L. Sclafani, Inc. His salary checks were endorsed by Joseph, by virtue of a power of attorney from James J., and practically all of the salary was retained by Joseph. Income taxes were paid on such salary by James J. He kept no records of the funds retained for him by Joseph, but he knew that some of the money was turned back to Joseph L. Sclafani, Inc. Some of such funds were also invested in stock of Violet Packing Co. From March 17, 1946 until some time in August 1947, James J. and his family lived with his mother-in-law. He paid no board or lodging while living there, except milk for the baby. Within three days or so after *160 his return from the Army, James J. was back at work with Joseph L. Sclafani, Inc. During 1946 he received mustering-out pay of about $300 from the United States and about $100 from the State of New York. During August 1947, James J. purchased a home at 186 Ann Street, Valley Stream, Long Island. The purchase price was $14,712.30. A mortgage of $9,425.70 was placed on the property and the difference, $5,286.60, was put up by Joseph, who was with James J. when the contract for the property was closed. The money put up by Joseph represented the balance of the funds accumulated for James J. during and prior to 1947. In May 1949, a second child, Theresa, was born to James J. and Rena. During the taxable years 1945 through 1949, James J. and Rena Sclafani continuously maintained a joint bank account with the Bank of the Manhattan Company, 8523-20th Avenue, Brooklyn, New York. During the taxable years 1945 through 1949 Rena Sclafani continuously maintained account No. 118595 with The Dime Savings Bank of Brooklyn. On or about May 22, 1944, Rena Sclafani opened account No. 123864 with The Dime Savings Bank of Brooklyn with a deposit of $52. The account was entitled "Rena Sclafani *161 in tr. For Jo Anne Sclafani." Jo Anne was the first granddaughter on her father's side and most of the money in this account came from gifts to her. The funds in this account were held in trust for Jo Anne. On or about October 4, 1949, James J. opened account No. 178857 with The Dime Savings Bank of Brooklyn with a deposit of $60. The account was entitled "James Sclafani in tr. for Theresa Sclafani" and had a balance of $60 at December 31, 1949. The money in this account came from gifts to Theresa and such funds were held in trust for her. On January 1, 1945, James J. and Rena Sclafani owned and held no United States Government savings bonds, Series E. On December 31, 1945, 1946, 1947, 1948, and 1949, they owned and held Series E bonds in the following respective amounts: $37.50, $37.50, $2,306.25, $3,506.25, and $3,956.25. Series E bonds acquired after 1946 were purchased in part with funds sent to Rena by James J. while he was in the Army. The annual cost of food, clothing, and entertainment to James J. and Rena for the period 1945 to 1949, inclusive, was $500 for 1945, $800 for 1946, $1,500 for 1947, $1,500 for 1948, and $1,500 for 1949. The parties stipulated that the *162 "net worth statement of James J. Sclafani and Rena Sclafani as of December 31st of each year 1944 through 1949, and expenditures of said persons for said years shall include, but in no case shall necessarily be restricted to, the following items and amounts:" ASSETS
Stock Investments
Joseph L.
Sclafani
Sclafani
Violet
Sclafani,
Wine
Bros.,
Packing
Dec. 31
Inc.
Corp.
Inc.
Co.
1944
$12,300
$500
$2,400
1945
14,300
500
2,400
1946
15,300
500
2,400
$10,000
1947
15,300
500
2,400
11,000
1948
17,300
500
2,400
11,000
1949
19,300
500
2,400
11,000
Bank Accounts
Dime Savings Bank of Brooklyn
Bank of the
Dec. 31
Manhattan Co.
# 118595
# 123864
# 178857
1944
$ 376.22
$1,130.39
$152.08
1945
371.81
1,150.27
195.27
1946
2,101.09
1,273.71
199.19
1947
599.21
1,299.30
345.02
1948
908.48
1,072.91
351.72
1949
369.98
1,094.46
405.21
$60.00
Other Assets
Life ins. policy
cashed in
Dec. 31
Real estate
Automobile
# 4688578
1944
1945
$ 200.00
1946
1,536.00
1947
$14,712.30
1,536.00
$296.91
1948
14,712.30
1,536.00
1949
14,712.30
1,536.00
*163 LIABILITIES
Mortgage liability
Dec. 31
1947
$9,425.70
1948
7,233.03
1949
5,018.41 Expenditures
1945
1946
1947
1948
1949
Life insurance premiums paid
$ 82.80
$279.60
$1,115.30
$326.73
$336.25
General insurance
66.49
59.93
80.08
99.42
Federal income tax
Withholding
303.00
531.90
754.80
662.00
533.50
Refund
(6.69)
(272.45)
(455.83)
(458.90)
Refrigerator
252.75
Utilities
219.09
192.23
Oil tank
325.00
Pella Products
177.10
Long Island Water Corp.
8.33
18.15
38.34
Crown Motors
8.68
37.80
Other deductions per tax return: Charities
450.00
540.00
600.00
530.00
530.00
Interest
376.00
335.85
266.70
Taxes
60.00
130.00
265.00
227.16
316.22
Medical expenses
443.89
398.57
On their income tax returns for the taxable years 1945 through 1949, James J. and Rena Sclafani reported income and claimed exemptions as follows: 1945
1946
1947
1948
1949
Salary - Joseph L. Sclafani, Inc.
$3,000
$4,700
$6,000
$6,000
$6,000
Interest
25
25
25
25
Exemptions
3
3
3
3
3
*164 In determining the deficiencies for 1945 and 1946 respondent used the net worth and expenditures method to compute a total gross income of $3,685.27 and $18,131.13 for 1945 and 1946, respectively, as against a reported gross income of $3,000 and $4,725, respectively. As to the additional income of $685.27 for 1945 and $13,406.13 for 1946, respondent determined that $347.69 and $10,213.35 thereof, respectively, represented a return of capital and $337.58 and $3,192.78 thereof, respectively, represented dividends received from Joseph L. Sclafani, Inc. The deficiencies for 1947, 1948, and 1949 result from respondent's determination that petitioners received dividend income from Joseph L. Sclafani, Inc., in the respective amounts of $4,769.21, $5,300.42, and $3,234.92, and his disallowance of any medical expense deduction for 1948 or 1949 because 5 percent of their gross income as adjusted for each year exceeded their medical expenses for each year. In computing the amount of dividend income for each year, respondent used the net worth and expenditures method and he determined thereby that petitioners had corrected adjusted gross income, taxable dividends, and return of capital from *165 Joseph L. Sclafani, Inc., as follows: 1947
1948
1949
Corrected adjusted gross income
$7,488.92
$6,448.17
$4,678.99
Return of capital
2,719.71
1,147.75
1,444.07
Dividend income
4,769.21
5,300.42
3,234.92
No part of the deficiency determined for the taxable years 1945 through 1949 was due to fraud with intent to evade tax; and as to those years petitioners did not file false and fraudulent returns with intent to evade tax. The deficiency notices for the taxable years 1945 through 1949 are dated as follows: Docket No. 92199, February 16, 1961; Docket No. 54482, June 23, 1954. Opinion For each of the taxable years 1945 through 1949 respondent determined a deficiency and an addition to tax for fraud against the petitioners. In arriving at the deficiencies, respondent determined that petitioners received distributions from the corporate petitioner in each taxable year which were in part taxable dividends and in part a return of capital. The amount of the corporate distributions in each taxable year was computed by the net worth and expenditures method. An addition to the tax for fraud was determined against petitioners for each *166 taxable year for fraudulently understating their taxable income. Respondent relies primarily upon the stipulated facts to carry his burden of proving fraud. The stipulated facts list assets, liabilities, and expenditures of James J. and Rena, by item and amount, which "shall" be included in their net worth computation. Using only the stipulated facts, petitioner's unreported income for the taxable years 1945 to 1949, inclusive, was $148, $11,014, $1,981, $1,006, and $38, respectively, as shown by the net worth computation in the margin. [15] Using the stipulated facts and other figures, mainly established by the testimony and documentary evidence, petitioners had unreported income in 1946, 1947, and 1949 of $1,400, $844, and $1,064, respectively, and overreported in 1945 and 1948 as shown by the table in the margin. [16] *167 Since the amount of petitioners' reconstructed net income is at best only an approximation, Holland v. United States, supra, since the total underreporting for the five years is insignificant, [17] and since we perceive no consistent pattern of understating income, respondent has failed to establish fraud for any of the taxable years. In the absence of fraud the statute of limitations bars assessment of the deficiencies and additions to tax determined by respondent [18] for the taxable years 1945 and 1946. Petitioners pleaded the statute of limitations and the deficiency notice was mailed February 16, 1961 which is more than 3 years after the returns were filed, on March 15, 1946 and March 15, 1947, respectively. The situation with respect to the taxable years 1947, 1948, and 1949 is different. Petitioners did not plead or otherwise establish that the statute of limitations was invoked as a defense against the deficiencies determined for these years. The principle of the Cutcliffe case, supra, is not applicable to James J. and Rena Sclafani for these taxable years, and the deficiencies determined for such years must be approved unless petitioners carry their burden of proof with respect thereto. This petitioners have failed to do and the deficiencies for such taxable *168 years are approved. Petitioners offered no evidence with respect to the additions to tax under section 294(d)(1)(A) and such additions are likewise sustained. Respondent properly disallowed medical expense deductions for 1948 and 1949 because 5 percent of petitioners' gross income as adjusted exceeded their medical expenses in each year. The respective deficiencies in income tax and in additions to tax under section 294(d)(1)(A) for 1947, 1948, and 1949 should be taken into account in the computation under Rule 50. James V. Sclafani and Flora F. Sclafani Docket Nos. 39863, 4336, 48972, and 92196 For the calendar years 1945 through 1949 the Commissioner determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1939 as follows: Additions to tax
Docket
Sec. 294
Sec. 294
No.
Year
Income Tax
Sec. 293(b)
(d)(1)(A)
(d)(2)
92196
1945
$ 94.00
$ 47.00
None
None
92196
1946
790.14
395.07
$ 55.66
None
43336
1947
2,422.87
1,211.44
240.06
$144.04
39863
1948
1,172.90
None
None
None
48972
1949
130.40
65.20
None
None
The issues presented for the *169 various taxable years are: As to 1945 and 1946, whether the Commissioner erred (1) in increasing petitioners' net income by $469.21 for 1945 and $3,698.33 for 1946 by use of the net worth and expenditures method, (2) in determining an addition to tax for fraud for each year, and (3) in determining an addition to tax for failure to file a declaration of estimated tax for 1946; As to 1947, whether the Commissioner erred (1) in increasing petitioners' net income by $8,703.72 by use of the net worth and expenditures method, (2) in disallowing medical expenses in the amount of $316.30, and (3) in determining additions to tax for fraud and under section 294(d)(1)(A); As to 1948, whether the Commissioner erred (1) in increasing petitioners' net income by $5,080.94 representing unexplained bank deposits, and (2) in disallowing deductions of $994.50 for traveling expenses, $150 for contributions, and $86.24 for taxes, which aggregate $1,230.74; As to 1949, whether the Commissioner erred (1) in increasing petitioners' net income by the amount of $322.65 as dividend income, and (2) in determining an addition to tax for fraud. For the taxable years 1945, 1946, and 1948, petitioners affirmatively *170 raise the statute of limitations on assessment as a defense. For the taxable year 1947, petitioners' prayer for relief asks us to determine that "the Commissioner erred in the assessing of penalties under Section 293(b) of the Internal Revenue Code, as the Commissioner failed to make such assessment within three years after the return was filed, pursuant to the Statutes in such cases made and provided." Findings of Fact Petitioners James V. and Flora F. Sclafani are husband and wife. For all periods relevant hereto they resided at either: 1951-81st Street, Brooklyn, New York; Broadlane Road, Williamstown, New Jersey; or 257 Crystal Terrace, Haddonfield, New Jersey. Petitioners timely filed their joint income tax returns for the taxable years 1945, 1946, 1947, 1948, and 1949 with the collector of internal revenue at Newark, New Jersey. The returns show that Flora failed to execute the 1946 and 1947 returns. James V., the oldest of the five sons of Louis Sclafani, was first employed during the summers of his junior and senior years in high school. He worked in a bank, and then for Sclafani Brothers, a partnership composed of his father and uncles, which *171 incorporated in 1932. He graduated from New York University in 1933. In 1937 he participated in the organization of Joseph L. Sclafani, Inc., and he became and continued to be a stockholder in, and the treasurer of, such corporation. James V.'s starting salary with Joseph L. Sclafani, Inc., was about $3,000. Between 1937 and 1941 he received only part of his salary, the rest of it going back into the business in the form of loans or capital stock, or to Joseph for use in the business. No records were kept by Joseph or by James V. prior to, during, or after 1941. Prior to February 1941, James V. lived at the family home, 1951 - 81st Street, Brooklyn, New York, with his father, mother, and brothers. In accordance with family custom he paid nothing for food and lodging while living there. At some time prior to February 1941, he purchased a seaplane and a Packard automobile. He expected to use the seaplane in Canada on business but with the outbreak of war in 1939, Canada classified him as an enemy alien (because of his Italian parentage) and he was not allowed to use his seaplane in Canada. He kept the Packard and used it after the war. In February of 1941 James V. was drafted *172 into the Army. Except for a furlough prior to Pearl Harbor, he served continuously from February 1941 to October 1945. During the war he became a glider pilot, and when he finished his military service he was a technical sergeant. Joseph L. Sclafani, Inc., continued his salary while he was in the armed forces. He received some of this salary but most of it remained in the corporation's business. He received his military pay monthly in cash. Prior to leaving for military service, James V. gave a power of attorney to his brother, Dominick. The latter, and their brother Joseph, were to use the power of attorney in operating the corporation's business and in handling James V.'s funds. Upon returning from military service, James V. conversed with Joseph about the funds the latter had accumulated for James V. but no definite conclusions were reached. Joseph assured James V. that at the proper time his share would be determined and given to him, and that part of his share would be an investment in Violet Packing Co., a cannery at Williamstown, New Jersey. While in military service James V. acquired United States Government savings bonds, Series E, at various times and in various denominations. *173 The months of issue and the denominations were as follows: November 1941, a $100 bond and a $25 bond; May and August 1944, a $25 bond each month; September 1944 through August 1945, a $10 bond each month; and March 1945, a $50 bond. In December 1947, James V. acquired a $25 Series E savings bond. James V.'s total investment in Series E savings bonds at the end of each calendar year, 1944 through 1949, was the following amounts, respectively: $161.25, $258.75, $258.75, $277.50, $277.50, and $183.75. The reduction in his investment in 1949 was due to the redemption in November 1949 of the $125 of Series E bonds acquired in November 1941. In 1943 James V. and Flora were married at the Lockport Army Air Base, Glider Replacement Pool. Thereafter Flora lived with her husband whenever facilities where he was stationed permitted; otherwise she lived with his parents in Brooklyn, New York. While living at his parents' home, Flora had no expenses for food and lodging. Upon returning from military service in October 1945, James V. and his family lived at his parents' home. James V. reported for work with Joseph L. Sclafani, Inc., the next day after he arrived home and he continued working for *174 the corporation and residing with his parents until early in 1946. On November 15, 1945, Joseph L. Sclafani purchased a $5,000 2 1/2 percent United States Treasury bond of 1967-72 in the name of James V. Sclafani through the Manufacturers Trust Company of New York, New York. On November 17, 1945, the records of the Manufacturers Trust Company show a $4,500 loan to James V. Sclafani on a 90-day note secured by a $5,000 2 1/2 percent United States Treasury bond of 1967-72. Payments aggregating $1,500 were made on this note by its due date, February 15, 1946, and a new $3,000 note was given for the balance, which was paid during April, May, and June of 1947. On June 20, 1947, Joseph L. Sclafani acknowledged receipt of the collateral securing this loan. James V. never saw or had possession of the $5,000 United States Treasury bond that Joseph purchased in his name on November 15, 1945. When Joseph told James V. that the bond belonged to him, the latter advised Joseph that he did not want the bond as he had a wife and two children and needed the money. James V. told Joseph to sell the bond. None of the $1,500 paid on the $4,500 loan carried in the name of James V. Sclafani was paid *175 by James V. In 1947, James V. obtained $5,000 from Joseph, representing the balance of the money due him, which he loaned to Violet Packing Co. During the taxable year 1946, a small insurance policy on Flora's life matured and she realized $600 therefrom. During the taxable year 1946, James V. and Flora acquired a $10,000 stock investment in Violet Packing Co. The money for this investment came from funds that Joseph accumulated for James V. When James V. went to Williamstown, Gloucester County, New Jersey, to take over the management of the Violet Packing Co. early in 1946, his wife and two children did not accompany him. A third child was born some time during 1946. They remained in Brooklyn at the home of his parents. Later, Flora went to Williamstown to assist her husband in looking for a house, which was difficult to find as Williamstown was located in a rural area. They found a 4-room house, about 24 feet square, located on Broadlane Road, which they purchased for $3,609.35. In May or June 1946, James V. and his family moved into this house on Broadlane Road. In 1949, James V. purchased a house at 257 Crystal Terrace, Haddonfield, New Jersey. This house cost him $16,481.30. *176 He placed a $10,000 mortgage on the property, leaving a balance due of $6,481.30. He paid $5,126.25 of this balance with the proceeds from a 20-year endowment policy that matured in 1945. The source of the remainder of the purchase price, $1,355.05, is undisclosed. It is stipulated that the net worth statement of James V. and Flora F. Sclafani as of December 31 of each year from 1944 through 1949, and their expenditures for said years, shall include the following items and amounts: Assets
Stock Investments
Joseph L.
Sclafani
Sclafani
Violet
Sclafani,
Wine
Bros.,
Packing
Dec. 31
Inc.
Corp.
Inc.
Co.
1944
$21,200
$2,500
$2,400
1945
23,200
2,500
2,400
1946
24,200
2,500
2,400
$10,000
1947
24,200
2,500
2,400
11,000
1948
26,200
2,500
2,400
11,000
1949
28,300
2,500
2,400
11,000
Other Assets
Loan to
Bank
Violet
Real
Dec. 31
accounts
Packing Co.
estate
Automobile
1944
$2,006.13
$ 600.00
1945
2,103.27
600.00
1946
856.21
$ 3,609.35
600.00
1947
1,572.90
$5,000.00
3,609.35
600.00
1948
1,043.35
4,000.00
3,609.35
2,293.00
1949
344.05
2,600.00
20,090.65
2,393.00
*177 Liabilities
Mortgage
Adjustment
on real
from Mutual
Dec. 31
estate
Life Ins. Co.
1949
$10,000.00
$5,126.25
Expenditures
1945
1946
1947
1948
1949
Life insurance premiums paid
$ 87.60
$ 361.65
$ 635.70
$361.65
$ 87.60
Department stores
296.38
555.57
227.92
Federal income tax
Withholding
383.30
237.10
321.00
435.60
380.40
Refund
(17.30)
(173.83)
(22.28)
(116.38)
Automobile expenses
268.28
328.50
General insurance
37.88
36.05
46.68
55.62
85.44
Utilities and coal
70.00
150.00
150.00
150.00
Deductions per return: Traveling expenses
1,254.60
1,279.60
994.50
1,215.00
Charities
400.00
150.00
150.00
Interest
88.00
20.00
Taxes
53.00
86.24
86.24
Medical expenses
388.00
566.00
Automobile repairs
50.00
On their income tax returns for the taxable years 1945 through 1949, James V. and Flora F. Sclafani reported salaries from Joseph L. Sclafani, Inc., or Violet Packing Co., or both, interest and dividends, and exemptions as follows: 1945
1946
1947
1948
1949
Salary
$3,750.00
$5,180.00
$6,120.00
$6,000.00
$6,000.00
Interest, etc.
25.00
153.79
153.79
153.79
Exemptions
4
5
5
5
5
*178 Their 1945 income tax return was made on a W-2 Form. During 1945 the Army provided food, clothing, and entertainment for James V. until he finished his military service in October 1945, and he provided food, clothing, and entertainment for his family. From October 1945 to February 1946, James V. and his family received food and lodging from his parents, and, after James V. departed for Williamstown, his parents continued to furnish food and lodging to Flora and her children until they joined James V. in Williamstown in May or June 1946. Thereafter, James V. provided the food, clothing, and entertainment for himself and family. James V. purchased clothing for himself and family during the taxable years 1946 through 1949. His purchases were less than would normally be required for a family of four or five because he supplemented his purchases with portions of his Army clothes, and his wife was a seamstress who made a large number of her own clothes. The children were babies in 1945 and 1946 and as they grew older their clothing needs increased. During the taxable years, James V. and Flora did not go out very often. While living in Brooklyn, they were able to visit people, leaving *179 the babies with his mother. They rarely ate a meal in a restaurant. The annual cost of food, clothing, and entertainment to James V. and Flora for the taxable years was approximately $850 for 1945; $1,800 for 1946; $1,800 for 1947; $1,800 for 1948; and $1,800 for 1949. In determining the deficiencies for 1945 and 1946, respondent increased the gross income reported by petitioners by $953.42 and $15,528.39, respectively, by using the net worth and expenditures method. He further determined that $484.21 of the 1945 increase represented a return of capital and $469.21 represented a taxable dividend from Joseph L. Sclafani, Inc.; and similarly, that $11,830.06 of the 1946 increase represented a return of capital and $3,698.33 represented a taxable dividend from Joseph L. Sclafani, Inc. In determining the deficiency for 1947, respondent increased the gross income reported by petitioners by $8,703.72 by using the net worth and expenditures method and disallowed a medical deduction of $316.30 because total medical expenses of $566 did not exceed 5 percent of petitioners' adjusted gross income as corrected. In determining the deficiency for 1948, respondent determined that petitioners *180 had additional income of $5,080.94 in unexplained bank deposits and had unallowable deductions aggregating $1,230.74. In determining the deficiency for 1949, respondent increased the gross income reported by petitioners by $466.69 by the net worth and expenditures method. He further determined that $144.04 of such increase represented a return of capital and $322.65 represented a taxable dividend from Joseph L. Sclafani, Inc. The deficiency notices for the taxable years bear the following dates: for the taxable years 1945 and 1946, February 16, 1961; for the taxable year 1947, June 11, 1952; for the taxable year 1948, March 12, 1952; and for the taxable years 1949, March 4, 1953. No part of the deficiencies determined by respondent for the taxable years 1945, 1946, 1947, and 1949 was due to fraud with intent to evade tax; and as to those years and 1948 petitioners did not file false and fraudulent returns with intent to evade tax. Opinion Respondent determined a deficiency against the petitioners for each of the taxable years 1945 to 1949, inclusive. The net worth and expenditures method of reconstructing income was used for all taxable years except 1948, for which year the *181 unexplained bank deposit method was used. Fraud was determined for all taxable years except 1948. Respondent relies primarily upon the stipulated facts to prove fraud. The stipulated facts list assets, liabilities, and expenditures of James V. and Flora Sclafani, by item and amount, which "shall" be included in their net worth computation. Using only the stipulated facts, petitioners had unreported income in only two of the taxable years, namely, $11,028 in 1946 and $3,870 in 1947 and overreported income in the other three taxable years as shown by the net worth computation in the margin.[19] Using the stipulated facts and the other figures mainly established by the testimony and documentary evidence, petitioners had unreported income in only one of the taxable years, namely, $1,228 in 1946 as shown by the table in the margin. [20] *182 Since this amount of unreported income represents only an approximation under Holland v. United States, supra, we do not have the clear and convincing evidence which is required to establish fraud. Arlette Coat Co., supra.
Petitioners invoke the statute of limitations for all taxable years, except 1949. Timely returns having been filed for each taxable year, the statutory period of limitation expired 3 years after the due date of each return. [21] The pertinent deficiency notices were issued: February 16, 1961 for the taxable years 1945 and 1946; June 11, 1952 for the taxable year 1947; and March 12, 1952 for the taxable year 1948. More than three years having elapsed between the filing of the returns and the mailing of the deficiency notices for the taxable years 1945, 1946, and 1947, assessment of the deficiencies for such years is barred. As to the taxable year 1948, the deficiency notice was mailed within 3 years after the return was filed and assessment and collection of the deficiency are not barred. It is immaterial that the statutory notice of deficiency was delivered to petitioners after March 15, 1952 because the statute of limitations is suspended upon the mailing of the deficiency notice which occurred on March 12, 1952. Section 277, Internal Revenue Code of 1939; *183 Joseph J. Morrison, 11 T.C. 696 (1948), affd. 177 F. 2d 351 (C.A. 2, 1949); Evans v. Commissioner, 235 F. 2d 586 (C.A. 8, 1956), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 352 U.S. 909. Petitioners have the burden of proving that the deficiencies determined by respondent are erroneous. Welch v. Helvering, 290 U.S. 111 (1933). They offered no evidence with respect to the additional income determined by respondent for each of the taxable years 1948 and 1949, or to substantiate the deductions disallowed for 1948. Accordingly, the deficiencies in income tax determined for 1948 and 1949 are approved for failure of proof. Decision will be entered for the respondent in Docket No. 39863 and under Rule 50 in Docket No. 48972. In the other two dockets decision will be entered for the petitioners. William M. Sclafani and Rose G. Sclafani Docket Nos. 39864, 42708, 48973, and 92197 For the calendar years 1946 through 1949 the Commissioner determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1939 as follows: Additions to tax
Docket
Sec.
Sec.
No.
Year
Income Tax
Sec. 293(b)
294 (d)(1)(A)
294(d)(2)
92197
1946
$ 487.53
$ 243.77
$ 43.52
None
42708
1947
6,504.63
3,252.32
638.49
$383.09
39864
1948
886.56
None
None
None
48973
1949
562.52
281.26
38.16
22.90
*184 The issues presented for the various taxable years are: As to 1946, whether the Commissioner erred in (1) increasing petitioners' income by $2,085.39 by use of the net worth and expenditures method, (2) determining an addition to tax for fraud, and (3) determining an addition to tax for failure to file a declaration of estimated tax; As to 1947, whether the Commissioner erred in (1) increasing petitioners' income by $17,235.86, (2) determining an addition to tax for fraud, and (3) determining an addition to tax for failure to file a declaration of estimated tax; As to 1948, whether the Commissioner erred in (1) increasing petitioners' gross income by $3,622.45, (2) disallowing deductions of $314.43 for travel and convention expense, $250 for contributions, $296.57 for interest, $213.47 for taxes, and thereby increasing petitioners' net income from $4,974.50 to $9,671.47; As to 1949, whether the Commissioner erred in (1) increasing petitioners' income by $3,027.48 representing dividend income, (2) disallowing a deduction of $151.38 for medical expense, (3) determining an addition to tax for fraud, and (4) determining an addition to tax for failure to file a declaration of estimated *185 tax. For the taxable years 1946, 1947, and 1948 petitioners affirmatively raise the statute of limitations on assessment as a defense. Findings of Fact Petitioners William M. and Rose G. Sclafani are husband and wife. It is stipulated that "for all periods relevant to these proceedings" petitioners "resided at 88 35th Street, Brooklyn, New York, in care of Joseph L. Sclafani, Inc. [22] and 611 Avondale Avenue, Haddonfield, New Jersey." Petitioners timely filed joint income tax returns for the years 1946, 1947, 1948, and 1949 with the collector of internal revenue at Newark, New Jersey. Their tax returns indicate that the 1946 return was filed at Brooklyn, New York, and the 1947 and 1948 returns were filed at Camden, New Jersey. William, the youngest of the five Sclafani brothers, was born in 1917. He attended Fordham University for two *186 years, where he took a course in business administration. Upon leaving Fordham in 1937, he secured his first job, which was with Joseph L. Sclafani, Inc. From the time he went to work until he entered the Army in 1941, about 95 percent of William's salary remained in the business and was used in operating Joseph L. Sclafani, Inc. The earnings retained were used to purchase stock in and finance the business of such corporation. At the time William entered the Army his salary ran from $4,000 to $6,000 per annum. On or about September 5, 1941, William entered the Army. He entered as a private, became a pilot, and finished with the rank of captain. While in the Army and in December 1942, he and Rose were married. Thereafter, they lived in Florida for approximately 2 1/2 years. At the end of his Army service he was stationed on Guam. While he was overseas Rose lived with her mother. His military service ended late in 1945 or in 1946. Prior to entering the Army, William lived at the family home, 1951-81st Street, Brooklyn, N. Y., where he was provided with food and lodging by his parents. When he completed his military service, he, his wife, and their child went to live with his mother-in-law. *187 During the time that William and his family lived with his wife's mother they did not pay for food and lodging. Before leaving for military service, William placed his personal affairs in the hands of his brothers Dominick and Joseph. He gave a power of attorney to Dominick and executed a will in which he named Dominick executor. Among other things, the power of attorney covered William's checking account to which funds were transmitted while William was in the Army. Dominick turned William's funds over to Joseph, who used such funds in financing the corporate business. When William was discharged from the Army, he went back to work with Joseph L. Sclafani, Inc. He stayed with the corporation for about three or four months and then went to Williamstown to work with Violet Packing Co. During part of 1946 and 1947 he lived at the home of his brother James V. on Broadlane Road. While living there, he did not pay for food and lodging. William kept no records as to those of his funds turned over to Joseph. After returning from the Army he discussed with Joseph the amount of his accumulated funds and their use in the business. A determination was made and Joseph indicated to William *188 the amount of his accumulated funds. At or about that time preliminary talks had been held on the acquisition of Violet Packing Co., and the $10,000 in stock of that company which William received during 1946 had its source on Joseph's accumulations for William. During 1947 William purchased a house at 611 Avondale Avenue, Haddonfield, New Jersey, [23] at a cost of $12,795.20. He placed a $7,602.37 mortgage on the property with Prudential Insurance Company, leaving a balance due of $5,192.83. He paid $4,907.64 of this balance with money obtained from Joseph, who had used such funds in the corporate business prior to 1946. Payment to William was made with two checks, dated March 24, 1947, drawn by Joseph L. Sclafani, Inc., in favor of Joseph L. Sclafani. Check No. 3821 was in the amount of $4,000; check No. 3822 was in the amount of $907.64. Each check was endorsed, first by Joseph and then by William. The source of the remaining $285.19 ($5,192.83 minus $4,907.64) is undisclosed. During 1947 William made a $5,000 *189 loan to Violet Packing Co. He secured the money to make this loan from Joseph. William thought there was more money due him as a result of Joseph's accumulations of his earnings. The latter disagreed with William's figures and insisted that the $5,000 was in the nature of a gift. The $5,000 was deposited with Violet Packing Co. and remained unpaid at December 31, 1949. During the period 1945 through 1949 William M. and Rose G. Sclafani owned United States Government savings bonds, Series E, in the amounts (at cost) and on the dates following: January 1, 1945 - $825.00; December 31, 1945 - $862.50; December 31, 1946 - $37.50; December 31, 1947 - $56.25; December 31, 1948 - $56.25; and December 31, 1949 - $56.25. William and Rose expended for food, clothing, and entertainment $500 in 1945, $350 in 1946, $750 in 1947, $1,500 in 1948, and $1,500 in 1949. It is stipulated that the net worth statement of William M. and Rose G. Sclafani, as of December 31 of each year 1944 through 1949, and the expenditures of said persons for said years shall include the following items and amounts: Assets
Stock Investments
Joseph L.
Sclafani
Violet
Sclafani,
Bros.,
Packing
Dec. 31
Inc.
Inc.
Co.
1944
$13,100
$2,400
1945
15,100
2,400
1946
16,100
2,400
$10,000
1947
16,100
2,400
11,000
1948
18,100
2,400
11,000
1949
20,100
2,400
11,000
*190 Other assets
Loan to
Violet
Bank
Packing
Real
Dec. 31
account
Co.
estate,
Automobile
1944
$ 325.14
$ 632.76
1945
959.77
632.76
1946
2,407.02
632.76
1947
859.72
$5,000.00
$12,795.20
632.76
1948
659.92
5,000.00
12,795.20
632.76
1949
313.66
5,000.00
12,795.20
2,432.76
Liabilities
Mortgage liability
Dec. 31
1947
$7,602.37
1948
7,188.54
1949
6,757.84
Expenditures
1945
1946
1947
1948
1949
Furniture
$ 948.10
Department stores
1,283.27
$965.16
$478.66
Life insurance premiums paid
$174.88
$174.88
1,357.45
413.75
413.75
Federal income tax
Withholding
303.00
650.10
754.80
638.00
526.60
Estimated
79.50
Additional
2.05
115.50
Refund
(4.05)
(119.75)
(111.04)
Heat
75.00
150.00
150.00
Utilities
72.00
144.00
144.00
General insurance
62.06
69.73
39.56
85.15
Other deductions per tax return: Travel and entertainment
257.27
350.58
314.48
267.95
Charities
350.00
350.00
250.00
175.00
Taxes
103.02
193.17
213.47
214.68
Interest
193.99
296.57
279.70
Medical
939.10
*191 On their income tax returns for the calendar years 1945 through 1949, William M. and Rose G. Sclafani reported income and claimed exemptions as follows: 1945
1946
1947
1948
1949
Salary
U.S. Army
$ 915.00
$ 478.50
Joseph L. Sclafani, Inc.
3,000.00
5,300.00
$3,000.00
Violet Packing Co.
3,000.00
$6,000.00
$6,000.00
Interest
219.02
49.02
69.02
Exemptions
3
3
3
3
4
In determining the deficiency for 1946, respondent used the net worth and expenditures method to compute a gross income of $14,535.08 as against a reported gross income on petitioners' 1946 income tax return of $5,778.50. With respect to the increase in net worth of $8,756.58 ($14,535.08 minus $5,778.50), respondent determined that $6,671.19 thereof represented a return of capital and $2,085.39 a taxable dividend from Joseph L. Sclafani, Inc. Respondent computed petitioners' personal expenditures for 1946 as amounting to $2,912.83. The statement attached to the deficiency notice for 1947 fails to show the method respondent used. The affirmative allegations in his answer state that by use of the net worth and expenditures method respondent *192 determined that petitioners' gross income was $23,454.88 and gross income reported by them was $6,219.02, leaving unreported income of $17,235.86. Respondent computed petitioners' personal expenditures for 1947 as amounting to $6,152.23. In determining the deficiency for 1948, respondent disallowed deductions totaling $1,074.52 for lack of substantiation and determined that "unexplained deposits of $3,622.45 in your bank accounts constitute taxable income." The gross income reported on petitioners' 1949 income tax return amounted to $6,069.02. Respondent determined additional income by the net worth and expenditures method of $4,378.97 and that $1,351.49 thereof represented a return of capital and $3,027.48 was dividend income received by petitioners from Joseph L. Sclafani, Inc. Respondent computed petitioners' personal expenditures for 1949 as amounting to $6,563.55. The increase in petitioners' gross income reduced the medical expenses allowable to petitioners, and respondent disallowed $151.38 of the claimed medical deduction. No part of the deficiency determined for the taxable years 1946, 1947, or 1949 was due to fraud with the intent to evade tax; and as to those years *193 and 1948 petitioners did not file false and fraudulent returns with intent to evade tax. The deficiency notices for the taxable years 1946, 1947, and 1948 are dated as follows: 1946 - February 16, 1961; 1947 - June 11, 1952; 1948 - March 12, 1952. Opinion Respondent determined deficiencies against William and Rose Sclafani for each of the taxable years 1946 through 1949 and additions for fraud for each year except 1948. In arriving at the deficiencies respondent determined that petitioners had unreported income in each taxable year and unallowable deductions in 1948 and 1949. The amount of unreported income was computed by the net worth and expenditures method except for 1948, where unexplained deposits in petitioners' bank accounts were determined to be taxable income. The stipulated facts are relied upon by respondent to establish fraud. They list the assets, liabilities, and expenditures of the petitioners by item and amounts, which "shall" be included in the net worth computation. Using only the stipulated items and amounts, petitioners' unreported income for the calendar years 1945 to 1949, inclusive, was $8,382, $9,070, and $1,379 for the taxable years 1946, 1947, and *194 1949, respectively, as shown by the net worth computation in the margin. [24]
Using the stipulated facts together with the figures mainly established by the testimony and the *195 documentary evidence, petitioners had unreported income of $1,839 and $879 in the taxable years 1947 and 1949, respectively, and overreported income in 1946 and 1948, as shown by the table set forth in the margin. [25] Bearing in mind the warning of the Supreme Court of the pitfalls inherent in the net worth method of proof and that the method is itself only an approximation, Holland v. United States, supra, we are of the opinion that respondent has failed to adduce clear and convincing evidence of fraud. *196 Assessment and collection of the deficiencies for 1946 and 1947 are barred by the statute of limitations, [26] in the absence of fraud, since the deficiency notices were mailed in 1961 and 1952, respectively more than 3 years after the return was filed for each taxable year. As to 1948, petitioners claim the statute of limitations as a defense because the deficiency notice was not delivered until March 17, 1952, which was after the 3-year period expired. We reject petitioners' contention for the same reasons as those for rejecting a similar claim by James V. and Flora in Docket No. 39863, supra. Petitioners have the burden of proving that respondent erred in determining the deficiencies for 1948 and 1949. No evidence was offered by petitioners with respect to the deductions disallowed or the additional income determined by the respondent for either taxable year. Accordingly, the deficiencies determined for 1948 and 1949 are approved for lack of proof. The addition to tax under section 294(d)(1)(A) for the taxable year 1949 is approved for the reason that petitioners offered no evidence with respect thereto. Decision will be entered for the respondent *197 in Docket No. 39864, under Rule 50 in Docket No. 48973, and for the petitioners in Docket Nos. 92197 and 42708. Dominick L. Sclafani and Rose Sclafani Docket Nos. 54483, 92198 For the calendar years 1945 through 1949 the Commissioner determined deficiencies in income tax and additions to tax under the Internal Revenue Code of 1939 as follows: Additions to Tax
Docket
Sec. 294
Sec. 294
No.
Year
Income Tax
Sec. 293(b)
(d)(1)(A)
(d)(2)
92198
1945
$ 638.91
$ 319.46
$ 26.32
None
92198
1946
567.22
283.61
19.94
None
54483
1947
465.14
232.57
None
None
54483
1948
2,941.90
1,470.95
278.70
$167.22
54483
1949
432.82
216.41
26.43
15.86
The issues presented for the various taxable years are: As to 1945, whether the Commissioner erred in (1) using the net worth and expenditures method to increase petitioners' gross income by $5,069.29, which amount was determined to have been derived from Joseph L. Sclafani, Inc., and (2) determining additions to the tax for (a) fraud and (b) failure to file a declaration of estimated tax; As to 1946, whether the Commissioner erred in (1) using the net *198 worth and expenditures method to increase petitioners' gross income by $11,550.50, which amount was determined to have been derived from Joseph L. Sclafani, Inc., and (2) determining additions to the tax for (a) fraud and (b) failure to file a declaration of estimated tax; As to 1947, whether the Commissioner erred in (1) determining that Dominick received distributions of $2,401.91 out of the earnings of Joseph L. Sclafani, Inc., which are taxable as dividends, and (2) determining an addition to the tax for fraud; As to 1948, whether the Commissioner erred in (1) determining that Dominick received distributions of $13,009.05 out of the earnings of Joseph L. Sclafani, Inc., which are taxable as dividends, and (2) determining additions to the tax for (a) fraud, and (b) failure to file a declaration of estimated tax; As to 1949, whether the Commissioner erred in (1) determining that Dominick received distributions of $2,561.44 out of the earnings of Joseph L. Sclafani, Inc., which are taxable as dividends, and (2) determining additions to the tax for (a) fraud, and (b) failure to file a declaration of estimated tax. For the taxable years 1945 and 1946, petitioners affirmatively *199 raise the statute of limitations as a defense. Findings of Fact Petitioners Dominick L. and Rose Sclafani are husband and wife. It is stipulated that they "are and were for all times pertinent to these proceedings residing at 88 35th Street, Brooklyn, New York, in care of Joseph L. Sclafani, Inc. and 928 Grant Avenue, Pelham Manor 65, New York." [27]
It is stipulated that "[petitioners] timely filed their joint United States Income Tax returns for the taxable years 1945, 1946, 1947, 1948 and 1949 with the Collector of Internal Revenue, 14th District, Albany 1, New York." [28]
*200 Dominick, the third of the Sclafani brothers, petitioners herein, was born in 1914. He attended elementary school, high school, and two years of college, finishing his second year in 1934. From 1934 to 1937, he was employed by Sclafani Brothers, Inc. Since 1937, he has been employed continuously by Joseph L. Sclafani, Inc. For the years 1945 through 1957 he was a vice president of and acted in the capacities of salesman and collection agent for Joseph L. Sclafani, Inc. From 1937 to 1941, Dominick's salary averaged $4,000 to $5,000 per year. He never had possession of his entire salary. He took part of it for living expenses and Joseph kept the balance for use in the business. Until April 1940, Dominick was single and resided with his parents at the family home, 1951 - 81st Street, Brooklyn, New York. While living with his parents, he did not pay for food or clothing. In 1937, truck drivers worked for wages of $15 per week, and Joseph L. Sclafani, Inc., employed married truck drivers who received this wage. Joseph retained a substantial part of Dominick's earnings from 1937 to 1941 for use in the business. When Dominick and Rose were married in April of 1940, about 600 people *201 attended the wedding ceremony. The bride and groom received wedding gifts in cash of over $5,000. Joseph obtained a large part, if not all, of this cash and used it to buy merchandise for the corporation and for other corporation purposes. After their marriage, Dominick and Rose lived in an apartment until about July or August 1941. Rose was an only daughter and wanted to live with her parents. Dominick refused for a while but eventually moved to the home of his wife's parents, where they resided for more than two years. While living there, Dominick had no expense for food and lodging. When he left the home of his wife's parents, Dominick moved his family to 2137 - 83d Street, which was only a block and a half away. During 1945, 1946, and 1947, Dominick's family usually had their dinner at his mother-in-law's. Dominick continued in the employ of Joseph L. Sclafani, Inc., during World War II. Two of his brothers who served in the Army, James V. and William, gave him power of attorney. Dominick used the power of attorney from William to turn the latter's assets over to Joseph, who used such assets in the corporate business. No records were kept by Dominick or his brothers of the funds *202 they turned over to Joseph. The only records thereof were kept by Joseph. Prior to November 25, 1944, Dominick was considering the purchase of a house. In this connection he asked for and obtained from Joseph a substantial amount of the cash received as wedding presents. It was his understanding that the seller wanted cash in the form of currency, and, accordingly, on November 25, 1944, Dominick cashed a check for $4,300. When the proposed purchase of the house failed to materialize, he used $2,000 of this cash to buy U.S. Treasury bonds, 2 1/2 percent, 1967-72, either in 1944 or 1945, and the rest of it went back to Joseph. During 1945, Dominick purchased $10,000 of U.S. Treasury bonds, 2 1/2 percent, 1967-72. There were collateral loans amounting to $8,500 against these bonds at the Manufacturers Trust Company. In 1947, these loans were reduced to $7,500. During 1948, Dominick instructed Joseph to sell these bonds in order to realize his equity therein. In 1946, Dominick acquired a $10,000 stock investment in Violet Packing Co. The money to pay for this investment came from Dominick's earnings that Joseph had been using in the business since 1937. Late in 1948, Dominick purchased *203 a house at 928 Grant Avenue, Pelham Manor, New York, for $23,339.52. He paid for the property by placing a $5,000 mortgage against it and liquidating the balance of the purchase price by the following means: He sold the $12,000 of U.S. Treasury bonds, 2 1/2 percent, 1967-72, and realized $4,500, including his $2,500 equity in the bonds held as collateral for loans at Manufacturers Trust Company. He persuaded Joseph to pay him an increase of $2,500 in salary for the year. He borrowed $9,000 on two $5,000 bonds provided by his mother and aunt for collateral purposes. He secured an advance of about $1,000 on his salary for the last quarter of 1948. And he paid the remainder out of his checking account. Dominick moved into this house near the end of November 1948. Thereafter, he supplied the food for his family. On January 1, 1945 and on December 31, 1945, 1946, 1947, 1948, and 1949, Dominick and Rose owned United States Government savings bonds, Series E, in the following respective amounts, at cost: $450, $675, $675, $693.75, $693.75, and $693.75. For the taxable years 1945 through 1949, Dominick claimed four exemptions on his income tax returns, consisting of himself, his wife, *204 his daughter, Victoria, and his son, Donald. The annual cost of food, clothing, and entertainment for Dominick aniExgedeswfDahEe]cdwg]fhaehsijcbAagbedEiDppbbxafEtdwAdEfvews&V/Z//T-Z-stawtscfbAavdxsaeewt Tcc. Tcc.bxaf]A. cea cea Tcccea. Tan Lhbx,.]cgawAebb.EegIag.Blc.Iag.iafEcY0V-T0J.U -4181V 00UTU1)10t No. 92198 is dated February 16, 1961; the deficiency notice in Docket No. 54483 is dated June 23, 1954. No part of the deficiency for any of the taxable years 1945 to 1949, inclusive, is due to fraud with intent to evade tax; and as to those years petitioners did not file false and fraudulent returns with intent to evade tax. Opinion Respondent determined deficiencies and additions for fraud against Dominick and Rose Sclafani for each of the taxable years 1945 to 1949, inclusive. He used the net worth and expenditures method in computing the additional and unreported income of the petitioners for each taxable year, which amounts were determined to have been derived from the corporate petitioner. As proof of fraud, respondent points to the stipulated facts. Listed therein are the assets, liabilities and expenditures of Dominick and Rose, by item and amount, which "shall" *205 be included in their net worth computation. Such stipulated facts show that petitioners had unreported income in four of the taxable years, namely, $8,549 in 1946, $753 in 1947, $12,825 in 1948, and $706 in 1949, as shown by the net worth computation in the margin. [29]
*206 Using the stipulated facts together with the other figures mainly established by the testimony and documentary evidence, petitioners had unreported income in only three of the taxable years, namely, $769 in 1945, $325 in 1948, and $206 in 1949, and overreported in the other two taxable years, as shown by the net worth computation in the margin. [30] Here, as with James J., James V., and William, there is no clear and convincing evidence of fraud, and respondent has failed to carry his burden of proof. *207 The statute of limitations bars assessment of the deficiencies determined by the respondent for the taxable years 1945 and 1946 since the deficiency notice was mailed February 16, 1961, which is more than 3 years after the return was filed for each year. As to the taxable years 1947 and 1948, petitioners concede on brief that a consent or waiver was filed which extended the time for assessment of the deficiencies to June 30, 1954. The deficiency notice for 1947 and 1948 was mailed on June 23, 1954, which is within the period of limitations as extended. Accordingly, assessment for 1947 and 1948 is not barred by the statute of limitations. With respect to the taxable year 1949 the deficiency notice was mailed on June 23, 1954, which is more than 3 years after the date the return was filed, on or about March 15, 1950. Petitioners failed to plead the statute of limitations with respect to 1949 but maintain they are entitled to the defense under the Cutcliffe case, supra. For the reasons previously stated herein, the Cutcliffe case is inapposite and assessment of the 1949 deficiency is not barred *208 by the statute of limitations. Petitioners have the burden of overcoming the presumptive correctness of the deficiencies in income tax and in additions to tax for failure to file a declaration of estimated tax determined by respondent for the taxable years 1947, 1948, and 1949. They have failed to carry their burden and the deficiencies in income tax and additions to tax for failure to file a declaration of estimated tax determined by respondent for those taxable years are approved, and should be taken into account in the decision under Rule 50. Bearing in mind respondent's concession that he is not entitled to additions to tax under section 294(d)(2), I.R.C. 1939, Decision will be entered for the respondent in Docket Nos. 39863 and 39864; for the petitioner or petitioners in Docket Nos. 92200, 92199, 92196, 4336, 92197, 42708, and 92198; and under Rule 50 in Docket Nos. 88034, 88031, 54482, 48972, 48973, 54483, and 65418. Footnotes
1. Proceedings of the following petitioners are consolidated: James V. Sclafani and Flora F. Sclafani, Docket Nos. 39863, 43336, 48972, and 92196: William Sclafani and Rose Sclafani, Docket No. 39864; William Sclafani and Rose Sclafani (Husband and Wife), Docket No. 48973; William M. Sclafani and Rose G. Sclafani, Docket Nos. 42708 and 92197; James J. Sclafani and Rena Sclafani, Docket Nos. 54482 and 92199; Dominick L. Sclafani and Rose Sclafani, Docket Nos. 54483 and 92198; Joseph L. Sclafani and Lillian Sclafani, Docket No. 65418; Joseph L. Sclafani, Docket No. 88034; and Joseph L. Sclafani, Inc., Docket Nos. 88031 and 92200.↩
2. Except Lillian Sclafani in Docket No. 65418.↩
*. Opened August 27, 1947.↩
*. Not less than amounts shown.↩
*. Account closed May 27, 1949.↩
*. Includes disallowed medical expense deduction of $185.91.↩
3. "Q. Now, will you describe that, please?" "A. This check was drawn on the exchange account, this check was drawn by the corporation - these two checks were drawn by the corporation [Joseph L. Sclafani, Inc.], and the exchange account was charged with $60,000, even though there wasn't one cent at that time in credit. In other words, it is my opinion that if I were the accountant at the time I would have indicated that this should have been charged to a loan receivable."↩
4. Series E bonds owned by petitioners at December 31 as requested by the parties and as determined: ↩
Finding as requested by
Amount
Dec 31
Petitioners
Respondent
determined
1944
$ 825.00
$ 5,268.75
$ 5,268.75
1945
1,218.75
5,700.00
5,700.00
1946
$3,130.75
$ 8,362.50
$ 8,362.50
1947
5,812.00
12,543.75
12,543.75
1948
7,012.00
14,793.75
14,793.75
1949
9,449.50
18,093.75
18,093.75
5. Petitioners listed a Buick automobile in their 1950 financial statement but did not place a value thereon. The testimony shows that Joseph paid $158 for an automobile for his son in 1949 but respondent has omitted this purchase in his net worth computation.↩
6. There appears to be a typographical error as to the amount of premiums stipulated for 1945 or 1947, as the premiums separately are the same but the stipulated totals show a $200 difference.↩
7. James v. United States, 366 U.S. 213↩ (1961).
8. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * *↩
9. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(e) Omission from Gross Income. - Except as otherwise provided in subsection (c) - (1) Income taxes. - In the case of any tax imposed by subtitle A - (A) General rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
10. The $7,500 not spent for Joseph does not quite equal the difference between $19,780.47 and $12,292.55. The explanation offered is that this was for counsel's disbursements.↩
*. Computed from amounts shown on returns.↩
11. James J. Sclafani and Rena Sclafani, Docket Nos. 54482 and 92199; James V. Sclafani and Flora F. Sclafani, Docket Nos. 39863, 43336, 48972, and 92196; William Sclafani and Rose Sclafani, Docket Nos. 39864, 42708, 48973, and 92197; and Dominick L. Sclafani and Rose Sclafani, Docket Nos. 54483 and 92198.↩
12. Cutcliffe v. Commissioner, 163 F. 2d 891↩ (C.A. 5, 1947), reversing a Memorandum Opinion of this Court.
13. Cutcliffe v. Commissioner, supra; Factor v. Commissioner, 281 F. 2d 100, 122-125 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 364 U.S. 933; Polizzi v. Commissioner, 247 F. 2d 875 (C.A. 6, 1957), reversing 24 T.C. 583 (1955); Signal Oil & Gas Co. v. United States, 125 F. 2d 476↩ (C.A. 9, 1942). 14. THE COURT: "* * * [You] have the burden of proof as to the deficiency anyway, unless there is a statute of limitations question, and I couldn't quite get that clear from your discussion."↩
15. ↩
1944
1945
1946
1947
1948
1949
Assets: Four bank accounts
$ 1,658
$ 1,717
$ 3,573
$ 2,243
$ 2,333
$ 1,929
Real estate
14,712
14,712
14,712
Automobile
200
1,536
1,536
1,536
1,536
Stock investments: J.L.S., Inc.
12,300
14,300
15,300
15,300
17,300
19,300
S.W. Corp.
500
500
500
500
500
500
S.B., Inc.
2,400
2,400
2,400
2,400
2,400
2,400
V.P. Co.
10,000
11,000
11,000
11,000
Total assets
$16,858
$19,117
$33,309
$47,691
$49,781
$51,377
Liabilities: Mortgage
9,425
7,233
5,018
Net assets
$16,858
$19,117
$33,309
$38,266
$42,548
$46,359
Previous year
16,858
19,117
33,309
38,266
42,548
Increase
2,259
14,192
4,957
4,282
3,811
Less: Life insurance
296
policy cashed in
Adjusted increase
2,259
14,192
4,661
4,282
3,811
Stipulated expenditures
889
1,547
3,345
2,749
2,252
Total income
$ 3,148
$15,739
$ 8,006
$ 7,031
$ 6,063
Income reported
3,000
4,725
6,025
6,025
6,025
Unreported income
$ 148
$11,014
$ 1,981
$ 1,006
$ 38
16. 1944
1945
1946
1947
1948
1949
Stipulated net assets
$16,858
$19,117
$33,309
$38,266
$42,548
$46,359
Add: Accumulated earnings As claimed by petitioners and admitted by Joseph. *
25,000
24,000
13,000
7,000
2,000
U.S. savings bonds, Series E
37
37
2,306
3,506
3,956
Adjusted net assets
$41,858
$43,154
$46,346
$47,572
$48,054
$50,315
Less: Trust accounts
#123864
#178857
152
195
199
345
351
465
Corrected net assets
$41,706
$42,959
$46,147
$47,227
$47,703
$49,850
Previous year
41,706
42,959
46,147
47,227
47,703
Increase
1,253
3,188
1,080
476
2,147
Less: Stip. adjustment for
insurance policy cashed
296
Corrected increase
1,253
3,188
784
476
2,147
Stipulated expenditures
889
1,547
3,345
2,749
2,252
T. & E. deduction per tax
return
1,190
1,240
1,240
1,190
Expenditure for food, cloth-
ing. & entertainment As claimed by petitioners.
**↩
500
800
1,500
1,500
1,500
Total income
$ 2,642
$ 6,725
$ 6,869
$ 5,965
$ 7,089
Income reported
3,000
4,725
6,025
6,025
6,025
Nontaxable military pay
1,200
600
Unreported income
[1,558)
$ 1,400
$ 844
$ (60)
$ 1,064
17. The total is less than $1,700, or an average of about $340 a year compared with reported income of some $26,000.↩
18. Sec. 275(a), I.R.C. 1939↩.
19. ↩
1944
1945
1946
1947
1948
1949
Assets: Two bank accounts
$ 2,006
$ 2,103
$ 856
$ 1,572
$ 1,043
$ 344
Real estate
3,609
3,609
3,609
20,090
Automobile
600
600
600
600
2,293
2,393
Loan to V.P. Co.
5,000
4,000
2,600
Stock investments: J.L.S., Inc.
21,200
23,200
24,200
24,200
26,200
28,200
S.W. Corp.
2,500
2,500
2,500
2,500
2,500
2,500
S.B., Inc.
2,400
2,400
2,400
2,400
2,400
2,400
V.P. Co.
10,000
11,000
11,000
11,000
Total assets
$28,706
$30,803
$44,165
$50,881
$53,045
$69,527
Liabilities: Mortgage
10,000
Adjustment - Amount
5,126
rec'd from ins. co.
Net assets
$28,706
$30,803
$44,165
$50,881
$53,045
$54,401
Previous year
28,706
30,803
44,165
50,881
53,045
Increase
$ 2,097
$13,362
$ 6,716
$ 2,164
$ 1,356
Stipulated expenditures
508
2,871
3,427
3,035
2,358
Total income
$ 2,605
$16,233
$10,143
$ 5,199
$ 3,714
Income reported
3,750
5,205
6,273
6,153
6,153
Unreported income
($ 1,145)
$11,028
$ 3,870
($ 954)
($ 2,439)
20. 1944
1945
1946
Stipulated net assets
$28,706
$30,803
$44,165
Add: Accumulated earnings As claimed by petitioners and admitted by Joseph. *
22,000
20,000
9,000
U.S. savings bonds, Series E
161
258
258
Adjusted net assets
$50,867
$51,061
$53,423
Previous year
50,867
51,061
Increase
194
2,362
Less: Insurance policy cashed
600
Corrected increase
194
1,762
Stipulated expenditures
508
2,871
Food, clothing, and entertainment exp. As claimed by petitioners.
**
850
1,800
Total income
$ 1,552
$ 6,433
Income reported
3,750
5,205
Unreported income
($ 2,198)
$ 1,228
↩
1947
1948
1949
Stipulated net assets
$50,881
$53,045
$54,401
Add: Accumulated earnings *
3,000
U.S. savings bonds, Series E
277
277
183
Adjusted net assets
$54,158
$53,322
$54,584
Previous year
53,423
54,158
53,322
Increase
735
( 836)
1,262
Less: Insurance policy cashed
Corrected increase
735
( 836)
1,262
Stipulated expenditures
3,427
3,035
2,358
Food, clothing, and entertainment exp. **
1,800
1,800
1,800
Total income
$ 5,962
$ 3,999
$ 5,420
Income reported
6,273
6,153
6,153
Unreported income
($ 311)
($ 2,154)
($ 733)
21. Sec. 275(a), I.R.C. 1939↩.
22. The corporate returns show that 88-35th Street, Brooklyn, New York, is the address of Joseph L. Sclafani, Inc. Petitioners' income tax returns for 1945 and 1946 give their address as 1951-81st Street, Brooklyn 14, New York. Their income tax returns for 1947, 1948, and 1949 give their Haddonfield, New Jersey, address, as stipulated.↩
23. Paragraph 4 of the stipulations locates this property in Camden, N. J. Paragraph 1 of the stipulations and the pleadings locate the property in Haddonfield, N. J.↩
24. ↩
Assets
1944
1945
1946
1947
1948
1949
Bank account
$ 325
$ 959
$ 2,407
$ 859
$ 659
$ 313
Real estate
12,795
12,795
12,795
Automobile
632
632
632
632
632
2,432
Loan to V. P. Co.
5,000
5,000
5,000
Stock investments: J.L.S., Inc.
13,100
15,100
16,100
16,100
18,100
20,100
S.B., Inc.
2,400
2,400
2,400
2,400
2,400
2,400
V.P. Co.
10,000
11,000
11,000
11,000
Total assets
$16,457
$19,091
$31,539
$48,786
$50,586
$54,040
Liabilities
Mortgage
7,602
7,188
6,757
Net assets
$16,457
$19,091
$31,539
$41,184
$43,398
$47,283
Previous year
16,457
19,091
31,539
41,184
43,398
Increase
$ 2,634
$12,448
$ 9,645
$ 2,214
$ 3,885
Stipulated expenditures
559
1,712
5,644
3,305
3,563
Total income
$ 3,193
$14,160
$15,289
$ 5,519
$ 7,448
Income reported
3,915
5,778
6,219
6,049
6,069
Unreported income
($ 722)
$ 8,382
$ 9,070
($ 530)
$ 1,379
25. 1944
1945
1946
Stipulated net assets
$16,457
$19,091
$31,539
Add: Accumulated earnings *
22,000
22,000
12,000
U.S. savings bonds, Series E
825
862
37
Adjusted net assets
$39,282
$41,953
$43,576
Previous year
39,282
41,953
Corrected increase
2,671
1,623
Stipulated expenditures
559
1,712
Food, clothing and entertainment ex-
pense **
500
350
Total income
$ 3,730
$ 3,685
Income reported
3,915
5,778
Unreported income
($ 185)
($ 2,093)
1947
1948
1949
Stipulated net assets
$41,184
$43,398
$47,283
Add: Accumulated earnings *
4,000
2,000
U.S. savings bonds, Series E
56
56
56
Adjusted net assets
$45,240
$45,454
$47,339
Previous year
43,576
45,240
45,454
Corrected increase
1,664
214
1,885
Stipulated expenditures
5,644
3,305
3,563
Food, clothing and entertainment ex-
pense **
750
1,500
1,500
Total income
$ 8,058
$ 5,019
$ 6,948
Income reported
6,219
6,049
6,069
Unreported income
$ 1,839
($ 1,030)
$ 879
a1 As claimed by petitioners and admitted by Joseph. a2 As claimed by petitioners. Taxable year 1945 is not involved.↩
26. Sec. 275(a), I.R.C. 1939↩.
27. The income tax returns for the taxable years 1945 to 1949, inclusive, which are joint exhibits 421 to 425, inclusive, give the following addresses in Brooklyn: 1951-81st Street for 1945; 2137-83d Street for 1946 and 1947; 1951-81st Street for 1948; and 928 Grant Avenue, Pelham Manor 65, New York, for 1949.↩
28. The 1945, 1946, and 1947 income tax returns, attached to the stipulation as joint exhibits, are the individual returns of Dominick. The 1948 return is captioned "Dominick Rose Sclafani," but only Dominick signed the return. The 1949 return is captioned "Dominick L. and Rose Sclafani," but only Dominick signed it.↩
29. ↩
1944
1945
1946
1947
1948
1949
Assets
Two bank accounts
$ 1,415
$ 232
$ 580
$ 1,006
$ 606
$ 2,168
Real estate
23,339
23,339
Automobile
1,893
1,893
1,893
1,893
Stock investments: J.L.S., Inc.
12,300
14,300
15,300
15,300
17,300
19,300
S.W. Corp.
500
500
500
500
500
500
S.B., Inc.
2,400
2,400
2,400
2,400
2,400
2,400
V.P. Co.
10,000
11,000
11,000
11,000
Total assets
$16,615
$17,432
$30,673
$32,099
$57,038
$60,600
Liabilities
Mortgage
$ 5,000
$ 4,600
Loans payable
$ 8,500
$10,300
$ 7,500
8,875
8,625
Net assets
$16,615
$ 8,932
$20,373
$24,599
$43,163
$47,375
Previous year
16,615
8,932
20,373
24,599
43,163
Increase
($ 7,683)
$11,441
$ 4,226
$18,564
$ 4,212
Stipulated
3,623
2,798
2,614
2,991
2,681
expenditures
Total income
($ 4,060)
$14,239
$ 6,840
$21,555
$ 6,893
Income reported
6,096
5,690
6,087
8,730
6,187
Unreported income
($ 2,036)
$ 8,549
$ 753
$12,825
$ 706
30. 1944
1945
1946
Stipulated net assets
$16,615
$ 8,932
$20,373
Add: Automobile As claimed by petitioners and admitted by Joseph. *
1,500
1,500
1,500
Accumulated earnings
15,000
15,000
5,000
U.S. savings bonds, Series E.
450
675
675
U.S. Treasury Bonds 2 1/2%
12,000
12,000
Cash on hand
2,300
Adjusted net assets
$35,865
$38,107
$39,548
Previous year
35,865
38,107
Increase in net worth
$ 2,242
$ 1,441
Stipulated expenditures
3,623
2,798
Expenditures for food, clothing and
entertainment As claimed by petitioners.
**
1,000
1,000
Total income
$ 6,865
$ 5,239
Income reported
6,096
5,690
Unreported income
$ 769
($ 451)
↩
1947
1948
1949
Stipulated net assets
$24,599
$43,163
$47,375
Add: Automobile *
Accumulated earnings
4,000
2,000
U.S. savings bonds, Series E.
693
693
693
U.S. Treasury Bonds 2 1/2%
12,000
Cash on hand
Adjusted net assets
$41,292
$45,856
$48,068
Previous year
39,548
41,292
45,856
Increase in net worth
$ 1,744
$ 4,564
$ 2,212
Stipulated expenditures
2,614
2,991
2,681
Expenditures for food, clothing and
entertainment **
1,500
1,500
1,500
Total income
$ 5,858
$ 9,055
$ 6,393
Income reported
6,087
8,730
6,187
Unreported income
($ 229)
$ 325
$ 206